UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 17-10378-NMG |
| | ) | |
| BRIAN AUGUSTINE JOYCE, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISQUALIFY ATTORNEY HOWARD M. COOPER AND REQUEST FOR AUTHORIZATION TO ISSUE A SUBPOENA TO ATTORNEY HOWARD M. COOPER LEAVE TO FILE GRANTED ON FEBRUARY 26, 2018 [D.E. 48]**

The United States of America, by and through its attorneys, respectfully moves this Court to disqualify Attorney Howard M. Cooper ("Attorney Cooper" or "Cooper") from representing defendant Brian Augustine Joyce ("Joyce") in this case. As alleged in the Indictment (ECF Dkt. No. 3), Joyce enlisted Attorney Cooper to make several material and false representations to the Massachusetts State Ethics Commission that were intentionally designed to conceal Joyce's ongoing criminal conduct, which now constitute the basis of several criminal counts and racketeering acts alleged in the Indictment. Because Joyce entangled Attorney Cooper in the cover-up and perpetuation of charged criminal conduct, Cooper is a percipient witness in this case. Furthermore, Cooper's representation of Joyce poses an actual or potential conflict of interest. Therefore, this Court should disqualify Attorney Cooper from representing Joyce at trial.

The government further moves this Court to (1) authorize the issuance of a subpoena *duces tecum* to Attorney Cooper pursuant to Fed. R. Crim. P. 17(c) for Attorney Cooper's file; (2) set a return date for compliance with the subpoena; and (3) perform an *in camera, ex parte* examination of any claimed attorney-client communications pursuant to *United States v. Zolin*, 491 U.S. 554

(1989), to determine whether those communications should be produced to the government because the crime-fraud exception to the attorney-client privilege applies.

**Relevant Facts and Allegations**[1]

On December 7, 2017, a federal grand jury returned a 113-count Indictment charging Joyce with, among other things, racketeering, honest services fraud, extortion under color of official right and conspiracy to defraud the IRS.  The racketeering charge and other criminal conduct alleged in the Indictment span from early 2010 through February 2016.

The Indictment contains detailed allegations describing former State Senator Joyce's efforts to exploit his official office for private gain in multiple corrupt schemes.  To perpetuate two of the schemes, as well as the tax fraud, Joyce intentionally used Attorney Cooper to prepare and submit multiple false and misleading responses to inquiries from the Massachusetts State Ethics Commission (the "Ethics Commission"), in order to conceal Joyce's ongoing racketeering activity.  Two of the misrepresentations advanced to the Ethics Commission, which was investigating allegations of misconduct by Joyce as a State Senator, form the foundation of racketeering acts 13B-50 and 15A-8 and counts 70 and 79 in the Indictment.[2]  A summary of the

---

[1] The relevant facts and allegations are culled from the Indictment.  Portions of the Indictment are cited herein as "Ind. at [page number(s)]."  Exhibits containing additional facts are attached hereto and cited herein as "Ex. [number] at [page number(s)]."  The exhibits attached to this pleading have been redacted to protect the identities of individuals and entities and to prevent disclosure of sensitive information.  With leave of the Court, the government will submit unredacted copies of the exhibits to the Court and defense counsel.

[2] As described herein, Joyce also used the services of another lawyer in Attorney Cooper's firm to submit responses to inquiries from the *Boston Globe* that the government alleges were similarly designed to give the veneer of legitimacy to Joyce's corrupt relationships and activities.  One of those responses forms the basis of racketeering act 15A-6 and count 77.

relevant criminal schemes and Joyce's intentional use of his attorneys' legal services to foster and conceal his criminal conduct follows.

**1. The Energy Insurance Brokerage Company (the "EIB Company") Bribery Scheme.**

The Indictment alleges that Joyce and the Chief Executive Officer for the EIB Company ("EIB CEO") conspired to use Joyce's official position as State Senator to sponsor, file, amend, and vote on property-assessed-clean-energy ("PACE") legislation, which benefitted the EIB Company, in exchange for a stream of benefits, including, but not limited to, payments of $5,000 per month between January 2012 and January 2016 and Joyce's beneficial ownership of approximately $471,250 in EIB Common Stock. Ind. at 17-31, 58-65, 75-79, 84, 87. In July 2012, Joyce called the EIB CEO to discuss how to amend House Bill 4119 ("H.B. 4119") to include language related to PACE that was favorable to the EIB Company. Ind. at 21. Using specific language provided by the EIB CEO's relative, Joyce then proposed an amendment to H.B. 4119, later adopted, to require a contractor or property owner to obtain a guarantee on the energy cost savings for PACE projects exceeding $500,000, with energy-saving insurance being one form of security – the precise type of insurance product that the EIB Company offered in the alternative energy market. *Id.*

Joyce's proposed amendments to H.B. No. 4119 were not approved in the 2012 legislative session, but were submitted to the Massachusetts Department of Energy Resources ("DOER") for further study. *Id.* In January 2013, after Joyce had directed the EIB Company to coordinate with his staff on PACE legislation, the EIB CEO's relative emailed Joyce's Chief of Staff again recommending that the DOER include energy-saving insurance language in PACE legislation, or, alternatively, language requiring "specifications within the underwriting guidelines set forth by the DOER[.]" Ind. at 22.

On January 17, 2013, Joyce filed PACE legislation as a stand-alone bill under Senate Bill No. 177 (the "Commercial PACE Bill"). Ind. at 22. The Commercial PACE Bill did not contain the PACE insurance language, which had been rejected by the DOER study, but it included the substance of the EIB Company's alternative language, which required that any PACE project be evaluated for "compliance with financial underwriting guidelines established by the agency." *Id.* In December 2013, the EIB CEO's relative continued to advise and collaborate with Joyce's Senate Office on re-drafting the Commercial PACE Bill to include language on "building resiliency" improvements in order to garner additional statewide support for PACE legislation. Ind. at 23. In July 2014, Joyce's Commercial Pace Bill was amended under Senate Bill No. 2255 (the "Amended Commercial PACE Bill") to allow the department to "promulgate regulations to include eligibility for resiliency improvements" for commercial PACE projects. *Id.* Shortly after purchasing approximately $471,250 worth of EIB Common Stock and while continuing to collect $5,000 per month in bribe payments from the EIB Company, Joyce re-filed the Amended Commercial PACE Bill in January 2015 (Senate Bill No. 1774), and gained appointment to a joint legislative committee that considered legislation involving alternative energy, including PACE legislation. Ind. at 20, 24, 27-28. This pro-EIB Company legislation was pending before the State Senate through early 2016, all while (i) Joyce continued to collect $5,000 per month in bribes and (ii) made false statements to the Ethics Commission via Attorney Cooper to perpetuate the scheme.

The Indictment also alleges that Joyce and the EIB CEO agreed that Joyce would use his official position as a State Senator to exert pressure on and advise Massachusetts Division of Insurance (the "DOI") officials to take official action in favor of the EIB Company, as specific opportunities arose, in exchange for a stream of corrupt benefits. Ind. at 19. Official action and

influence with the DOI was an invaluable asset to the EIB Company because EIB Company, as a

managing insurance agent, was subject to yearly oversight by the DOI. *See* Ind. at 17-18. An

illustrative example occurred prior to June 3, 2013, when an out-of-state insurance company

("Ins. Co. A") filed a complaint with the DOI against EIB Company. Ind. at 24. Because Ins.

Co. A's complaint with the DOI had the potential to result in license suspension or other serious

administrative action by the DOI against the EIB Company, Joyce and the EIB CEO agreed that

Joyce would use his official position to advise the Commissioner of the DOI (the

"Commissioner") to refrain from taking official action adverse against the EIB Company. Id.

On June 3, 2013, Joyce, the EIB CEO, and other EIB Company representatives met with

the Commissioner at the DOI to obtain favorable DOI action on Ins. Co. A's complaint against

the EIB Company. Ind. at 24. In recounting the meeting, Joyce emailed the Commissioner on

July 11, 2013, noting that "we detailed the dispute between the parties and addressed the issues

contained in [Ins. Co. A's] letter to the Insurance Division[,]" and asking if any further action

was required of the EIB Company from the DOI. Ind. at 25. The Commissioner responded that

no further action was required and, ultimately, with respect to Ins. Co. A's complaint, the DOI

took no action that was adverse to the EIB Company. *Id*.

As further alleged in the Indictment, in order to promote, facilitate, and prevent detection

of this corrupt scheme, Joyce took numerous steps to conceal the extent of his relationship with

the EIB Company, including, but not limited to, using his attorneys to advance false and

misleading responses to inquiries from the Ethics Commission and the *Boston Globe*. Ind. at 25-

26. On April 3, 2015, for example, in response to a Globe reporter's inquiry, Joyce falsely

claimed, through another lawyer at Cooper's firm (copying Attorney Cooper): "Senator Joyce

has not filed <u>any</u> legislation to benefit [the EIB Company]" (underline in original). Ind. at 25.

This representation was simply untrue.  As detailed above and in the Indictment, Joyce did file legislation that directly and substantially benefited the EIB Company, and Joyce knew it.

The Indictment similarly alleges that between October 2015 and January 2016, while Joyce continued to receive monthly bribe payments from the EIB Company, Joyce, through Attorney Cooper, made materially false statements to the Ethics Commission, including Joyce's claims that: (i) because such PACE bills did not contain an insurance provision, he "did not believe that his bill [S.B. 177; S.B. 1774], either directly or indirectly, could reasonably be viewed as benefitting [EIB Company];" and (ii) Joyce understood and believed that his role in the June 3, 2013 meeting with the DOI Commissioner "was simply to provide notice to [the DOI of Ins. Co. A's complaint against EIB Company]" and that Joyce "believed that his attendance at the meeting was ministerial in nature." Ind. at 26, 61, and 79 (Count 70 and Racketeering Act 13B-50).  Joyce, through Attorney Cooper, also falsely claimed that, "Senator Joyce's firm … did not charge any client a fee for attending this meeting."  Ex. 1 at 7.

As described above, Joyce did intend to benefit the EIB Company through his repeated attempts to pass PACE legislation.  Had his efforts proved successful, Joyce himself would have personally benefitted as a shareholder in the company – especially if the EIB Company went public.  It was therefore critical for Joyce to use Attorney Cooper's legal services to conceal Joyce's ongoing racketeering activity from the Ethics Commission and the public while PACE legislation was still pending in the House and Senate.

Moreover, Joyce's attendance at the June 3, 2013 meeting, was not simply to provide ministerial legal services.  *See* Mass. Gen. Laws ch. 268A, § 4 (prohibiting state legislator from appearing before a state agency for compensation in a particular matter unless the matter is, among other things not applicable here, "ministerial in nature").  As agreed upon with the EIB

CEO, Joyce was to use his official position to convince DOI officials to refrain from taking adverse official action against the EIB Company relative to Ins. Co. A's complaint. Even setting aside the corrupt agreement, Joyce's role in representing the EIB Company at the meeting was not "ministerial in nature." *See id*. (defining "ministerial functions" as including, without limitation, "the filing or amendment of: tax returns, applications for permits or licenses, incorporation papers, or other documents."). Joyce himself described that the purpose of the meeting was to "…detail[] the dispute between the parties and address[] the issues contained in [Ins. Co. A's] letter to the Insurance Division." In addition, Joyce's false representation (through Cooper) – that Joyce's firm received no compensation for attending the meeting at the DOI – concealed Joyce's receipt of $5,000 per month from the EIB Company in exchange for using his official position as a State Senator to obtain favorable action by the DOI.

### 2. The EIB Common Stock – IRS Wire Fraud Scheme

The Indictment alleges that in or about the summer or fall of 2014, the EIB CEO agreed to offer Joyce privately held EIB Common Stock in exchange for defendant Joyce's continued official action with respect to PACE and DOI matters. Ind. at 26. Joyce wanted to become one of the larger and more influential shareholders of EIB Company, and also reap a greater profit from his corrupt relationship with the EIB CEO by obtaining the EIB Common Stock prior to any public offering of EIB Common Stock. *Id*. The custodian of Joyce's IRA account, however, would not authorize a purchase of EIB Common Stock as a tax-free rollover using Joyce's existing simplified employee pension IRA ("SEP-IRA") assets. Ind. at 29. Joyce nevertheless orchestrated the purchase of $471,250 worth of EIB Common Stock by drawing from a home equity line of credit in August 2014 and executing a series of early, taxable withdrawals from his and his spouse's SEP-IRAs in October and December 2014. Ind. 27-28. Joyce attributed the

EIB Common Stock purchase to fictitious retirement accounts created for himself and his spouse. Ind. at 28.

On or about October 30, 2015, Attorney Cooper submitted a letter to the Ethics Commission on Joyce's behalf claiming that,

> Senator Joyce did not personally participate in the [EIB Company's] private placement opportunity. However, he did direct his retirement account 'Brian A. Joyce SEP IRA' to purchase [EIB Common] stock in late 2014 and again in 2015 . . . Senator Joyce's IRA continues to hold these shares.

Ind. at 30, 78; Ex. 1 at 9.

These representations to the Ethics Commission were patently false because (i) Joyce personally executed the purchases, and not through a third party custodian, and (ii) Joyce initially purchased EIB Common Stock with funds that he obtained from a home equity line of credit loan, and not with retirement funds. Ind. at 30. Joyce's characterization of the EIB Common Stock purchase as an acquisition by retirement accounts, which were, in fact, fictitious, as advanced through Cooper: (a) permitted Joyce to conceal his significant beneficial ownership of EIB Common Stock from the public and the Ethics Commission, while he actively pushed PACE legislation at the direction of the EIB CEO;[3] and (b) served as a vehicle for Joyce to utilize retirement funds to purchase EIB Common Stock by defrauding the IRS in claiming that his purchase of EIB Common Stock was a tax-free IRA rollover of $429,629, when, in fact, it was an early liquidation subject to additional taxation and early withdrawal penalties. Ind. at 28, 30.

---

[3] As set forth in the Indictment, under state law Joyce had to disclose publicly in his Statement of Financial Interest, filed annually with the Ethics Commission, his and his spouse's ownership of any security or investment of more than $1,000 (*excluding* retirement plans, 401(k) plans, etc.). Ind. at 3-4.

### 3.  The Coffee Franchise Bribery Scheme

The Indictment alleges that Joyce and a coffee franchise owner (the "Franchise Owner") conspired to use Joyce's official position as State Senator to promote, sponsor, and file state legislation that favored the Franchise Owner, as specific opportunities arose, in exchange for a stream of benefits that included payments for purported legal services and regular free deliveries of up to a thousand dollars' worth of coffee and other goods to Joyce.  Ind. at 31.

On January 30, 2015, the *Boston Globe* published an article describing, among other things, Joyce's gifting of one-pound bags of coffee from the Coffee Franchise to each State Senator during the holidays in December 2014.  Ind. at 33.  On February 1, 2015, Joyce telephonically contacted the Franchise Owner's relative (the "Relative"), and informed the Relative that Joyce had "a problem" with the free coffee that the Franchise Owner provided to him in December 2014 and that Joyce needed the Relative to create an invoice for the December 2014 coffee.  *Id*.  After the February 1, 2015 call, at Joyce's direction, the Relative created an invoice that was backdated to December 20, 2014, and purported to bill Joyce $1,698 for 200 pounds of Coffee Franchise coffee.  *Id*.  Joyce then issued a check for $1,698 to the Coffee Franchise that was backdated to December 21, 2014, in order to create the false impression that Joyce had paid for the 200 pounds of coffee at or around the time that Joyce had received the free coffee in December 2014.  Ind. at 33-34.

From October to November 2015, the Ethics Commission contacted Attorney Cooper, inquiring about whether Joyce had received Coffee Franchise coffee at no charge in late 2013 and in 2014.[4]  Ind. at 34.  On December 1, 2015, Attorney Cooper, at Joyce's direction, emailed

---

[4] As alleged in count 77 and racketeering act 15A-6, on or about April 3, 2015, another lawyer from Attorney Cooper's firm also sent a letter to a *Boston Globe* reporter informing the reporter that Joyce paid the Coffee Franchise for 200 bags of coffee he distributed in late

the Ethics Commission copies of the fraudulently backdated invoice and check, and stated that: "In late 2014, Senator Joyce purchased coffee from a [Coffee Franchise] franchisee … owned by [the Franchise Owner]." Ind. at 34. This statement was a deliberate misrepresentation on Joyce's part because Joyce had made no efforts to purchase the coffee before the publication of the January 30, 2015 *Boston Globe* article. *Id*. Attorney Cooper further represented to the Ethics Commission that Joyce had provided legal services in late 2013 pertaining to a drive thru at a coffee franchise in a specific town, "but [Joyce] did not send a bill in consideration of the client providing his firm with coffee…." Ex. 3. That representation similarly was untrue because the Franchise Owner and the Relative had not agreed to pay Joyce in 2013 with coffee in exchange for legal work pertaining to the coffee franchise drive-thru. Ind. at 34.

In January 2016, after the Ethics Commission contacted Attorney Cooper requesting the Franchise Owner's contact information so that the Commission could interview the Franchise Owner regarding defendant Joyce's claim that he had provided legal services in exchange for free coffee in 2013, Joyce met with the Franchise Owner and the Relative and instructed them to falsely represent to the Ethics Commission that the Franchise Owner had agreed to provide Joyce coffee in exchange for legal services. Ind. at 34-35. After that meeting, Joyce met individually with the Relative and stressed that he needed the Relative to affirmatively and falsely represent to the Ethics Commission that Joyce received the coffee in exchange for legal services, and the Relative acted accordingly on February 4, 2016. *Id*.

On February 5, 2016, while legislation filed and supported by Joyce that benefitted the Franchise Owner remained under consideration in the State Legislature, Attorney Cooper, at

December by means of a check dated December 21, 2014, in the amount of $1,698. See Ex. 2 at 2.

Joyce's direction, emailed the Ethics Commission a materially false response to its inquiry,

claiming that Joyce had received 75 bags of coffee in exchange for legal services provided in late

2013, but had "always understood that the services he provided exceeded the value of any coffee

he received."  *See* Ind. at 33, 35; Ex. 4 at 3.

### Legal Argument

The law is clear that a defendant's right to counsel of choice is qualified and not absolute.

In *Wheat v. United States*, 486 U.S. 153, 159 (1988), the Supreme Court recognized that

although the "right to select and be represented by one's preferred attorney is comprehended by

the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate

for each criminal defendant rather than to ensure that a defendant will inexorably be represented

by the lawyer whom he prefers."  Similarly, the First Circuit has noted that, "[a]n accused's right

to select his own counsel … cannot be insisted upon or manipulated so as to obstruct the orderly

procedure in the courts or to interfere with the fair administration of justice."  *United States v.*

*Cortellesso*, 663 F.2d 361, 263 (1st Cir. 1981) (quoting *United States v. Bentvena*, 319 F.2d 916,

936 (2d Cir.), *cert. denied*, 375 U.S. 940 (1963)).  Thus, while disqualification of counsel is

generally a measure of last resort, *In re Grand Jury Proceedings*, 859 F.2d 1021, 1026 (1st Cir.

1988), courts may nevertheless limit a defendant's selection of counsel if it results in undue

delay of legal proceedings, *see, e.g., United States v. Poulack*, 556 F.2d 83, 86 (1st Cir. 1977), or

creates an actual or potential conflict of interest.  *See, e.g., United States v. Lanoue,* 137 F.3d

656, 663 (1st Cir. 1998); *United States v. Lemieux*, 532 F. Supp. 2d 225, 230 (D. Mass. 2008).

I.      **Attorney Cooper Should be Disqualified from Representing Joyce Because Joyce Intentionally Involved Attorney Cooper as a Percipient Witness in Charged Criminal Conduct**.

Courts have recognized a limitation on the prerogative of the defendant to be represented by counsel of his choice when the government calls that attorney as a witness at trial.  *See United States v. Gomez*, 584 F. Supp. 1185, 118, 1190 (1984) ("It is apodictic that, 'where defense counsel's testimony is important to the government's case, the best alternative is for counsel to withdraw.'")  (quoting *Grady v. United States*, 715 F.2d 402, 404 (8th Cir. 1983)).  To assess whether disqualification of defense counsel is appropriate in circumstances where that attorney may be called as a witness, trial courts must balance a defendant's right to counsel of his choice against the government's need to present its case effectively and the court's independent obligation to serve justice.  *United States v. Diozzi*, 807 F.2d 10, 12 (1st Cir. 1986).  "Where the government's proffer of a defense attorney's testimony will force the attorney's removal, the government may only call the attorney as a witness if, without his or her testimony, 'the government must settle for less than its best evidence.'" *United States v. Hallock*, 941 F.2d 36, 44 (1st Cir. 1991) (quoting *United States v. Cortellesso*, 663 F.2d at 363)).  The First Circuit, however, has rejected the notion that the government must demonstrate that the evidence is unobtainable from other sources if it meant that the government must settle for something less than its best evidence, stating, "[i]t is inconceivable that defendant's right to a particular counsel should be permitted to impose artificial disadvantages upon the government." *Cortellesso*, 663 F.2d at 363.

Here, Attorney Cooper is not a witness to some peripheral matter in the case.  Joyce enlisted Attorney Cooper's legal assistance to conceal and perpetuate the ongoing criminal schemes explicitly charged in the Indictment.  The obvious problem, therefore, is that by doing

so, Joyce placed Attorney Cooper squarely in the role of percipient witness, i.e., someone who was a participant in, and has first-hand knowledge of, important events to be explored at trial. The best evidence of Attorney Cooper's involvement at Joyce's direction in concealing and perpetuating the charged criminal conduct comes from Cooper himself, who not only prepared written submissions and submitted backdated documents on behalf of Joyce, but also dealt directly with investigators from the Ethics Commission, which had the ability to expose and derail Joyce's ongoing corrupt practices.

Joyce or Attorney Cooper may cite to *United States v. Diozzi*, 807 F.2d 10 (1st Cir. 1986) for the proposition that attorney disqualification is unnecessary if an affidavit can suffice as a substitute to calling the attorney as a witness. But the facts and circumstances in *Diozzi* are inapposite to the facts at bar and *Diozzi* should not apply. The defendants in *Diozzi* were convicted of multiple counts of income tax evasion. *Id*. The government moved to disqualify defense counsel only six days before trial on the ground that it intended to call them as witnesses at trial. *Id*. at 12. In support of its motion, the prosecution identified false or misleading statements contained in two separate submissions prepared by counsel and submitted to the federal government as "evidence of the defendants' consciousness of guilt." *Id*. The trial court allowed the government's motion to disqualify, but on appeal the First Circuit reversed, concluding that the defendants' offer to stipulate to the defendants' statements contained in the written submissions and made by counsel acting under valid power of attorney was sufficient to avoid disqualification. *Id*. at 14.

The present case is distinguishable in several important respects. First, this case involves the application of the crime-fraud exception; *Diozzi* did not. *Diozzi* involved two circumscribed accountings of the defendants' taxes filed with the IRS and Justice Department after the IRS had

inquired as of the defendants' already-completed criminal conduct in submitting false tax returns.  In contrast, the present case involves multiple false and misleading communications submitted to the Ethics Commission during a period when Joyce continued to receive a stream of corrupt payments in exchange for his official action and while legislation benefitting Joyce's co-conspirators was still pending in the State Legislature.

Second, Cooper's statements are not all self-explanatory nor do they describe all the circumstances giving rise to his communciations with the Ethics Commission.  Cooper's representations to the Ethics Commssion do not identify the source of information (whether it is Joyce, Cooper, or someone else), which may be vital to proving Joyce's state of mind and intent.  Additionally, email communications (that Attorney Cooper produced to the government) that were between Joyce, Cooper, and others leading up to critical claims about events – such as the timing of the alleged "purchase" of the 2014 coffee – have been heavily redacted, and therefore vital information regarding the facts and circumstances giving rise to the misrepresentations are unknown to the government.  No affidavit or stipulation can resolve these issues.

In *Diozzi*, the government could have entered into a stipulation as a substitute for testimony from the attorney because the evidence that the government sought at trial in *Diozzi* was contained within the four corners of the proposed stipulation.  Here, the government cannot intelligently agree to a stipulation because the evidence that the government seeks at trial extends beyond the four corners of the simple paper communications that Cooper sent to the Ethics Commission (*e.g.,* redacted materials as well as other communications between Cooper and Joyce that precipated the false submissions to the Ethics Commission).  Simply put, a stipulation in this case effectively operates to block the government from accessing and using its best evidence despite the fact that the government has shown "a reasonable basis to believe that the

lawyer's services were used by the client to foster a crime or fraud." *See In re: Grand Jury Proceedings*, 417 F.3d 18, 23 (1st Cir. 2005).

Finally, there exists a serious potential or actual conflict of interest that did not exist in *Diozzi* due to Joyce's enlistment of Cooper as an active participant in concealing the ongoing racketeering activity.  For example, Joyce could elect to take the stand and testify that the misleading communications to the Ethics Commission regarding the purchase of EIB Common Stock were made on advice of Attorney Cooper.  Such an advice-of-counsel or lack of *mens rea* defense would trigger an immediate, serious conflict of interest. *See United States v. Swafford*, 512 F.3d 833 (6th Cir. 2008) (disqualification of defense counsel proper even though defendant waived advice-of-counsel defense); *United States v. Wilson*, No. 10-20581, 2011 WL 740200, at *6 (E.D. Mich. Feb. 24, 2011) ("Presenting [an advice-of-counsel] defense with the advising attorney in the position of trial counsel would give rise to the most obvious conflict of interest."). Alternatively, in such a situation Joyce may instead opt to forego exercising his constitutional right to testify because doing so would make his own attorney an adverse witness.  Either way, the issue of a potential or actual conflict of interest was never raised or addressed in *Diozzi*, but it remains a critical issue in this case.

Even in cases involving potential conflicts of interests, the Supreme Court has observed that district courts have an independent interest in ensuring that all "criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160; *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2565-66 (2006).  "Although a presumption exists in favor of the defendant's selection of counsel, it may be overcome by a showing of a serious potential for conflict." *In re Grand Jury Proceedings*, 859 F.2d 1021, 1024 (1st Cir. 1988).  In assessing motions to disqualify counsel,

this Court should balance a defendant's competing Sixth Amendment rights: the qualified right to be represented by counsel of choice and the right to an attorney who is free from conflicts of interest. *Wheat*, 486 U.S. at 158-59.

Even in circumstance where a defendant offers to waive a potential conflict of interest, the Supreme Court has held that a district court has "substantial latitude" to decline a proffered waiver and insist that a defendant obtain conflict-free counsel. *Wheat*, 486 U.S. at 163. Trial judges must be accorded broad latitude in this area because:

> Unfortunately for all concerned, a district court must pass on the issue of whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.

*Id.* at 162. Furthermore, Courts recognize that notwithstanding a waiver, a client could later present a successful appeal claiming ineffective assistance of counsel based on the waived conflict. *See Wheat*, 486 U.S. at 161-62 (district courts have an interest in insulating their fairly rendered verdicts from appellate reversal for ineffective assistance of counsel).

In *United States v. Schwarz*, 283 F. 3d 76, 95-96 (2d Cir. 2002), the Second Circuit found that certain actual or potential conflicts cannot be waived. The First Circuit has held that an actual conflict results when an attorney could pursue a plausible strategy or tactic and that strategy or tactic was "inherently in conflict with … the attorney's other interests." *United States v. Soldevila-Lopez*, 17 F.3d 480, 486 (1st Cir. 1994) (addressing the First Circuit standard for showing an actual conflict); *United States v. Moscony*, 927 F.2d 742, 750 (3rd Cir. 1991) (citations omitted) (a conflict of interest arises whenever an attorney's loyalties are divided). The First Circuit has further noted that cases addressing unwaivable conflicts of interest "tend to

involve circumstances in which an attorney has reason to fear that a vigorous defense of the client might unearth proof of the attorney's criminality." *See United States v. Saccoccia*, 58 F.3d 754, 772 (1st Cir. 1995); *see Soldivelia-Lopez*, 17 F.3d at 487 n.4 (noting that "*[p]er se* Sixth Amendment violations have been found where trial counsel was implicated in the crime for which his client was on trial …").[5]

In *Saccoccia*, the Appeals Court found that the district court committed no error in accepting the defendant's waiver of actual or potential conflicts of interest with his attorney. The Circuit, however, left unanswered the question of whether certain conflicts of interest between attorney and client are unwaivable because, in *Saccoccia*, the record failed to show how defense counsel's hypothetical conflict actually affected his representation of the client. *Saccoccia*, 58 F.3d 772. Of course, an actual attorney-client conflict of interest that affects the adequacy of the client's representation denies a defendant the Sixth Amendment right to effective assistance of counsel, regardless of whether prejudice is shown. *See United States v. Fahey*, 769 F.2d 829, 834 (1st Cir. 1985).

---

[5] *But see Yeboah-Sefah v. Ficco*, 556 F.3d 53, 69 (1st Cir. 2009) (quoting *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994) ("'Even where an actual conflict exists,' however, a defendant 'may waive this conflict … and elect to have the attorney continue representation, so long as that waiver is knowing, intelligent, and voluntary.'"). In *Ross*, however, the Eleventh Circuit warned that even in a scenario where a defendant waives, "a court need not accept a waiver of right," *Ross*, 33 F.3d at 1524.

> Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.... Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.

*Id.*, citing *Wheat*, 486 U.S. at 160.

Here, a serious potential conflict of interest exists where Joyce involved Attorney Cooper in actively concealing his ongoing corruption and Joyce now seeks Cooper's representation in defending Joyce at trial against charges arising from that corrupt activity.  At this juncture, whether Attorney Cooper knowingly assisted Joyce in covering up Joyce's ongoing racketeering activity is unknown to the government.  However, documents in the government's possession pertaining to the EIB Company suggest that a more thorough investigation by Cooper of Joyce's responses to the Ethics Commission may have been warranted.  For example, on May 12, 2016, an investigator from the Ethics Commission emailed Cooper requesting "pertinent documentation from Mr. Joyce's SEP-IRA account" which would verify the accuracy of Cooper's earlier representation regarding the purchase of EIB Common Stock in the fall 2014 and winter 2015.  Ex. 5.  On May 25, 2016,[6] the investigator again emailed Attorney Cooper asking for "bank statements or electronic transfer records" confirming that Joyce's SEP-IRA purchased EIB Common Stock in September 2014 and January 2015, noting that this request was in addition to the previous request "for relevant statements from the SEP-IRA account confirming that this stock is in an IRA account."  Ex. 6.  The next day, in response to the Ethics Commission's requests, Attorney Cooper did not provide the IRA third-party custodian records, but instead produced a record from a "NASDAQ Private Market account" and a corporate record of ownership generated by the EIB Company itself (which was addressed to Joyce personally at his home address, not to his SEP-IRA).[7]  Ex. 7.

---

[6]  As of this date, Joyce still held thousands of shares of EIB Company stock and PACE legislation was still pending.

[7] The government anticipates introducing into evidence at trial records pertaining to the Joyce's retirement accounts that do not reflect the acquisition, transfer, or rollover of EIB Common stock into the Joyce's SEP-IRAs.

Given the serious constitutional considerations raised by Attorney Cooper's continued representation of Joyce at trial, it would be entirely within this Court's discretion to disqualify Cooper in circumstances of this case.  *See United States v. Anderson*, 319 F.3d 1218, 1222 (10th Cir. 2003) (disqualification of defense counsel upheld given counsel's involvement as a witness in matters related to charges at hand); *United States v. DeFazio*, 899 F.2d 626, (7th Cir. 1990) (disqualification of defendant's chosen attorney not an abuse of discretion given likelihood that attorney would be material witness).

In addition to the constitutional concerns discussed above, Attorney Cooper's representation of Joyce at trial implicates certain ethical rules.  If Attorney Cooper did testify, he would be "in the untenable position of providing testimony against his client" *United States v. Evanson*, 584 F.3d 904, 914 (10th Cir. 2009), and most likely would need to withdraw from his representation of Joyce under ethical codes.  *United States v. Locasio*, 6 F.3d 924, 934 (2d Cir. 1993).  As Judge Selya observed, "[t]he canons of ethics … plainly indicate that the dual roles of counsel and witness are, in the main, mutually exclusive; and courts have consistently deplored such double service … Put more simply, 'the roles of advocate and witness are fundamentally incompatible.'"  *United States v. Gomez*, 584 F. Supp. 1185, 1188 (1984) (citations omitted).

Even if Cooper did not testify, he might nonetheless act as an "unsworn witness" who could "subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *Locasio*, 6 F.3d at 933.  "When an attorney is an unsworn witness, [], the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired." *Locasio*, 6 F.3d at 934.

The Massachusetts Rules of Professional Conduct generally prohibit an attorney from representing a client at a trial in which that attorney is likely to be a necessary witness, except

when (1) the testimony relates to an uncontested issue, (2) the testimony relates to the nature and value of legal services rendered in the case, or (3) disqualification of the lawyer would work substantial hardship on the client.  Mass. R. Prof'l Conduct 3.7(a).  An attorney who is likely to serve as a necessary witness at his client's trial may be disqualified because "[c]ombining the roles of advocate and witness can prejudice the opposing party."  Mass. R. Prof'l Conduct 3.7(a) cmt. 1.  "A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others.  It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof."  Mass. R. Prof'l Conduct 3.7(a) cmt. 2.[8]

None of Rule 3.7's three exceptions to the general prohibition against a lawyer appearing as both witness and advocate in the same proceeding obtain to the present case.  Attorney Cooper's anticipated testimony has nothing to do with the nature and value of his legal services nor is his testimony related to an uncontested issue in this case.  As discussed above, the government is in no position to enter into a stipulation where it lacks the foundational information needed to confirm whether Joyce's disclosures to the Ethics Commission were accurate or complete.  Moreover, disqualification of Cooper at this early stage in the proceedings would not result in a substantial hardship on Joyce, particularly where co-counsel is available to

---

[8] Two other rules of professional conduct are potentially relevant in this case.  Rule 1.7(b) of the Massachusetts Rules of Professional Conduct provides in part, "A lawyer shall not represent a client if the representation of that client may be materially limited by … the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation …"  However "when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent."  *Id*. cmt 5.  Rule 1.10 states in pertinent part, "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so …."

represent Joyce and it appears Cooper may still participate in the preparation of pre and post-trial matters. *Gomez*, 584 F. Supp. at 1190.

## II.   This Court Should Authorize the Issuance of a Subpoena for Documents to Attorney Cooper and Conduct an *Ex Parte* Hearing to Determine Whether the Crime-Fraud Exception to the Attorney-Client Privilege Applies.

The crime-fraud exception is a well-established qualification to the general rule that confidential communications between an attorney and client are protected from disclosure. *See Clark v. United States*, 289 U.S. 1, 15 (1933); *In re Grand Jury Proceedings*, 417 F.3d 18, 22 (1st Cir. 2005). It withdraws the protection typically accorded to lawyer-client communications when a client seeks to employ legal representation to commit or facilitate a crime or fraud. *See United States v. Rakes*, 136 F.3d 1, 4 (1st Cir. 1998) ("[T]he attorney-client privilege is forfeited inter alia where the client sought the services of the lawyer to enable or aid the client to commit what the client knew or reasonably should have known to be a crime or fraud."). The existence of the exception "ensures that the attorney-client privilege will 'not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.'" *In re Grand Jury Proceedings*, 183 F.3d at 75 (quoting *Reeder*, 170 F.3d at 106).

The crime-fraud exception to the attorney-client privilege "excludes communications from client to attorney made (1) when the client was engaged in (or was planning) criminal or fraudulent activity, and (2) with the intent to facilitate or conceal the criminal or fraudulent activity." *United States v. Albertelli*, 687 F.3d 439, 450 (1st Cir. 2012). In order to pierce the attorney-client privilege under this exception, a party must make a prima facie showing that the exception applies. *See In re: Grand Jury Proceedings*, 417 F.3d 18, 22 (1st Cir. 2005). Such a showing is made if "there is a reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud." *Id.* at 23. This "reasonable basis" is shown by "something less than a

mathematical (more likely than not) probability that the client intended to use the attorney in furtherance of a crime or fraud." *Id*. The inquiry focuses on the intent of the client, not the attorney, and "requires the client's use or aim to use the lawyer to foster the crime or the fraud." *In re Grand Jury Proceedings*, 183 F.3d 71, 79 (1st Cir. 1999).

Here, the Indictment alleges that Joyce engaged in racketeering and other criminal activity from early 2010 through February 2016. Between April 2015 and February 2016, Joyce used his attorneys' legal services to conceal his ongoing corrupt activities from the Ethics Commission as well as the *Boston Globe* by advancing false and misleading claims, including claims that Joyce: (i) "did not believe that [the Commercial PACE Bills], either directly or indirectly, could reasonably be viewed as benefitting [EIB Company]"; (ii) received no compensation for attending the June 3, 2013 meeting at the DOI and "believed that his attendance at the meeting was ministerial in nature"; (iii) "direct[ed] his retirement account … to purchase [EIB Common Stock]"; (iv) purchased coffee from a [Coffee Franchise] franchisee" in late 2014; and (v) accepted free coffee in exchange for legal services in a 2013 coffee-for-legal services barter transaction (Ind. at 35). As explained above, concealment of Joyce's criminal activities from the state agency investigating him for ethics violations and from the public at large was critical to ensuring the continued success of the ongoing EIB Company and Coffee Franchise schemes.

This case is closely analogous to *United States v. Gorski*, 807 F.3d 451, 456, 460 (1st Cir. 2015). In that case, the government alleged that Gorski, a non-veteran, falsely represented to federal contracting officers that his company, Legion Construction, Inc., was owned and controlled by one or more service-disabled veterans in order to qualify for set-aside and sole-source contracts from various government agencies. *Id*. at 455-56. When Gorski learned that the government program to benefit disabled veterans would undergo changes, he retained lawyers to help to

restructure his corporation and conceal his fraud, filing a written submission drafted by his attorneys and supported by backdated corporate documents in response to a bid protest filed with the Small Business Administration. *Id*. at 456. After conducting an *in camera* examination of documents produced by Gorski's attorneys in response to a government subpoena, the District Court ordered the production of several categories of materials under the crime-fraud exception. *Id*. at 457. On interlocutory appeal, the First Circuit affirmed the District Court's order.[9]  The Appeals Court held that the indictment provided a reasonable basis to believe that Gorski/Legion was engaged in fraudulent activity.  *Id*. at 461.  The Court next concluded that there was a reasonable basis to believe that Gorski sought legal assistance with the intent of creating an outward appearance of compliance with federal regulations while maintaining hidden ownership and control of the company.  *Id*. Thus, the Court concluded, the District Court had a reasonable basis to conclude that the attorney-client communications were intended by Gorski to facilitate or conceal the fraud.  *Id*.

Here, the Indictment similarly provides a reasonable basis to believe that Joyce was engaged in ongoing criminal activity, including efforts to cover his tracks.  Joyce, like Gorski, utilized the services of Attorney Cooper to file written submissions supported by backdated instruments with a state investigative agency – the Ethics Commission.  Like *Gorski*, there is a reasonable basis to conclude that Joyce enlisted Cooper's assistance with the intent of creating the outward appearance of legitimacy in dealing with the EIB Company and the Coffee Franchise in order to deflect the Ethics Commission's inquiry and to conceal his ongoing scheme to deprive the public of his honest services, engage in a Hobbs Act conspiracy, and conspire to defraud the IRS.

---

[9] The First Circuit also vacated the District Court's order quashing the government's subpoena as to a separate category of documents.  *Id*. at 462-63.

This Court, therefore, could conclude, similar to *Gorski*, that there was a "complete congruence" between Cooper's representation of Joyce before the Ethics Commission and Joyce's intent to conceal his ongoing criminal conduct and deflect the Ethics Commission's inquiry. *See Gorski*, 807 F.3d at 462.

Moreover, evidence that Joyce intentionally misled the Ethics Commission to perpetuate his crimes with the assistance of his attorney outweighs any potential adverse effect on the attorney-client relationship. *See Clark v. United States*, 289 U.S. 1, 15 (1933) ("[a] client who consults an attorney for advice that will serve him in the commission of a [crime] will have no help from the law. He must let the truth be told."); *see also United States v. Textron Inc.*, 577 F.3d 21, 31 (1st Cir. 2009). If, as the government submits, Joyce communicated with Cooper for the purpose of advancing or concealing his criminal conduct, "the rationale that underpins the [attorney-client] privilege vanishes." *In re Grand Jury Proceedings*, 183 F.3d 71, 75 (1st Cir. 1999); *see also In re Grand Jury Proceedings*, 417 F.3d 18, 22 (1st Cir. 2005) (observing that crime-fraud exception to attorney-client privilege "withdraws protection where the client sought or employed legal representation in order to commit or facilitate a crime of fraud").

The First Circuit, however, has noted that it can be difficult to determine whether the attorney-client relationship has been misused by the client for criminal or fraudulent acts without seeing the document, or hearing the testimony, as to which the privilege is claimed. *In re Grand Jury Proceedings*, 183 F.3d at 75. To overcome this problem, judges are permitted to review privileged materials *in camera* and then decide whether the crime-fraud exception applies. *See United States v. Zolin*. 491 U.S. 554, 572 (1989); *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir.1997). "A lesser evidentiary showing is needed to trigger an in camera review than is required ultimately to overcome the privilege." *Zolin*, 491 U.S. at 572; *see also United States v. Edg*ar, 82

F.3d 499, 509 (1st Cir.), *cert. denied* 519 U.S. 870 (1996).  To justify a review of attorney-client communications under *Zolin*, the judge need only require "a factual basis to support a good-faith belief by a reasonable person, (citation omitted), that in camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id*.  As described above, the government clearly has exceeded the "good-faith belief" standard articulated by *Zolin*.

**Conclusion**

For the above-enunciated reasons, the government respectfully urges this Court to disqualify Attorney Cooper from representing the defendant at trial and to authorize the issuance of a subpoena *duces tecum* to Attorney Cooper so that the Court can perform an *in camera, ex parte* examination of any claimed attorney-client communications to determine whether the crime-fraud exception to the attorney-client privilege should apply.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ William F. Bloomer*
DUSTIN CHAO
WILLIAM F. BLOOMER
Assistant U.S. Attorneys
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
Dated: February 26, 2018          (617) 748-3100

**CERTIFICATE OF SERVICE**

I, William F. Bloomer, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/William F. Bloomer*
WILLIAM F. BLOOMER
Assistant U.S. Attorney