# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | )   Criminal No. 1:17-CR-10378-NMG |
| v. | ) |
|  | ) |
| BRIAN AUGUSTINE JOYCE, | )   **LEAVE TO FILE EXCESS PAGES** |
|  | )   **GRANTED MARCH 30, 2018** |
| Defendant. | ) |
|  | ) |

### OPPOSITION OF BRIAN A. JOYCE AND HOWARD M. COOPER TO THE GOVERNMENT'S MOTION TO DISQUALIFY ATTORNEY HOWARD M. COOPER AND REQUEST FOR AUTHORIZATION TO ISSUE A SUBPOENA TO HOWARD M. COOPER

Max D. Stern (BBO #479560)
Howard M. Cooper (BBO #543842)
Christian G. Kiely (BBO #684308)
Todd & Weld LLP
One Federal Street
Boston, Massachusetts 02110
(617) 720-2626
*mdstern@toddweld.com*
*hcooper@toddweld.com*
*ckiely@toddweld.com*

*Attorneys for Brian A. Joyce*

Martin F. Murphy (BBO # 363250)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
(617) 832-1000
*mmurphy@foleyhoag.com*

*Attorney for Howard M. Cooper*

The government has moved to disqualify Attorney Howard M. Cooper as counsel in this case, advancing the extraordinary proposition that it should be permitted to make him a witness against his own client, Brian A. Joyce, and subpoena his file. The government's motion renews arguments it made, but which Judge Young rejected, during the grand jury phase of this case. In denying the government's prior motion, Judge Young "expresse[d] grave concern about the government's practice of subpoenaing" defense counsel, which "might result in the disqualification of counsel from representing their clients due to an artificially-created conflict of interest." *In re Grand Jury Subpoena*, 273 F. Supp. 3d 296, 306 (D. Mass. 2017). Unfortunately, the government now seeks to create the very result which so troubled Judge Young.

### Statement of the Case

Joyce was a Massachusetts State Senator from 1998 to 2017. He is also a member of Massachusetts Bar and, as permitted under Massachusetts law, maintained a law practice while he held office. The indictment charges, as relevant here, that Joyce received benefits from two of his legal clients, an insurance company and a coffee shop franchise owner, in return for official acts to be taken for their benefit rather than legal services. Joyce categorically denies the charges. The indictment was preceded by a series of articles in *The Boston Globe*, an investigation by the Enforcement Division of the Massachusetts State Ethics Commission, a federal grand jury investigation and a search of Joyce's law office on February 17, 2016. The indictment was returned on December 7, 2017.

Joyce engaged Cooper (who has both criminal defense and defamation law expertise) in late March 2015, after the *Globe* starting asking Joyce questions. *See* Affidavit of Howard M. Cooper, attached hereto as Exhibit A, at ¶ 2. When the Ethics Commission subsequently commenced an investigation, Joyce engaged Cooper to represent him in that investigation. *Id.* at ¶ 4. The Ethics Commission made its first written inquiry to Joyce on September 22, 2015, and Cooper submitted Joyce's response to that and several further requests for information, including responses dated October 30, 2015, December 1, 2015, January 27, 2016, and February 5, 2016 that are at issue in the present motion. *Id.* at ¶ 5.

The government seeks to disqualify Cooper, and call him as a witness against Joyce, because it alleges that Cooper made six allegedly "false and misleading claims" to the Ethics Commission on Joyce's behalf "[b]etween April 2015 and February 2016." Gov't Memo. at 22. The government contends that Joyce's communications to Cooper related to these statements are not privileged since made for the purpose of committing a crime or fraud; that the government is therefore entitled to call Cooper as a witness and subpoena his file because he is "percipient witness" to the "cover-up"; and that, since Cooper cannot be both a witness and counsel, he must be disqualified. Alternatively, the government argues that Cooper and Joyce's interests are in conflict because "Joyce involved Attorney Cooper in actively concealing his ongoing corruption and Joyce now seeks Cooper's representation in defending Joyce at trial against charges arising from that corrupt activity." Gov't Memo. at 18. The government offers no evidence suggesting that Cooper knowingly engaged in any wrongdoing or knowingly made false statements. Indeed, in a closed hearing before Judge Young in March 2017, it stated categorically that it had no evidence that he did. (A copy of the transcript of that hearing, which Judge Young recently unsealed despite the government's efforts to keep it secret, is attached as Exhibit B).

The government's motion is fundamentally flawed.  *First*, it runs directly into contrary First Circuit precedent, *United States v. Diozzi*, 807 F.2d 10 (1st Cir. 1986), which held, on facts strikingly similar to those present here, that disqualification of counsel on account of pre-indictment false statements made to the IRS on behalf of tax fraud defendants was a wrongful denial of counsel of choice in violation of the Sixth Amendment, requiring reversal without the need for any showing of prejudice.  *Second*, the government's conflict theory is baseless and, in any event, Joyce, fully informed by independent counsel, agrees to waive any purported conflict.  *Third*, the government's request for a Fed. R. Crim. P. 17 subpoena to Cooper ignores the rule that actually applies here—Rule 16—which explicitly forbids the prosecution from obtaining the information it seeks.  *Fourth*, the crime-fraud exception applies only where a client uses a lawyer to commit an ongoing or future crime or fraud; Cooper's representation of Joyce—and, in particular, the six statements he made on Joyce's behalf to the Enforcement Division of the Ethics Commission—concerned only *past* actions taken by Joyce.  Moreover, the government has also failed to establish a necessary prerequisite for invoking the crime-fraud doctrine in this context: it has failed to offer any evidence establishing that Cooper's statements were false or intended to further a crime or fraud.  Indeed, it has not produced any evidence supporting its contentions at all, and its reliance on the fact of the indictment against Joyce is misplaced.

The defendant stands before this Court after years of investigation have already led, as a *fait accompli*, to the loss of his job, the end of his law practice, and the exhaustion of his resources.  Now the government takes aim at the one attorney who has represented him throughout, in whom he reposes the greatest trust and confidence, and asks the Court to require him to start over with new counsel he does not want and cannot afford.  This would be a cruel, unfair and clearly unconstitutional blow.

3

## Argument

**I.     The Government Has Not And Cannot Demonstrate A Legitimate Need For Cooper's Testimony Sufficient To Overcome Joyce's Sixth Amendment Right To Choose Cooper As His Lawyer.**

Now that Joyce has been indicted and his Sixth Amendment right to counsel has attached, *United States v. Gouveia*, 467 U.S. 180, 185 (1984), the government faces an even greater burden in justifying its efforts to disqualify Cooper than the burden it failed to meet in the grand jury phase, where Judge Young rejected the government's attempt to force Cooper to testify. The Sixth Amendment does not permit the government, for tactical reasons, to "veto" Joyce's selection of Cooper as his defense counsel absent a "legitimate justification." *United States v. Stein*, 541 F.3d 130, 154, 156 (2d Cir. 2008).  Here, the government cannot demonstrate a need for Cooper's testimony sufficient to justify his disqualification.  Joyce has offered to stipulate to the only evidence which the government has legitimate reason to believe Cooper could provide. Under controlling First Circuit precedent, disqualifying Cooper in these circumstances would work a Sixth Amendment violation requiring reversal of any resulting conviction.  *See Diozzi*, 807 F.2d 10.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI. The Supreme Court has made clear "that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him."  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006).  *Cf. Powell v. Alabama*, 287 U.S. 45, 53 (1932).  The right to select one's own counsel "reflects constitutional protection of the defendant's free choice independent of concern for the objective fairness of the proceeding."  *Flanagan v. United States*, 465 U.S. 259, 268 (1984).  The government must "honor" a defendant's Sixth Amendment right

to counsel of his choice and cannot "veto" that choice "without good reason." *Stein*, 541 F.3d at

154.  As articulated by the Supreme Court:

> This means more than simply that the State cannot prevent the accused from
> obtaining the assistance of counsel. The Sixth Amendment also imposes on the
> State an affirmative obligation to respect and preserve the accused's choice to
> seek this assistance.... [A]t the very least, the prosecutor and police have an
> affirmative obligation not to act in a manner that circumvents and thereby dilutes
> the protection afforded by the right to counsel.

*Maine v. Moulton*, 474 U.S. 159, 170-71 (1985).

Accordingly, "[i]n moving to disqualify [a criminal defendant's] chosen counsel, the

government bears a heavy burden of establishing that disqualification is justified." *Diozzi*, 807

F.2d at 12.  "[A]ttorney disqualification is a 'drastic remedy,' reserved for cases where the

attorney has 'entangled himself to an extraordinary degree' with his client." *Fonten Corp. v.*

*Ocean Spray Cranberries, Inc.*, 469 F.3d 18, 23 (1st Cir. 2006) (quoting *United States v.*

*Locascio*, 6 F.3d 924, 934 (2d Cir. 1993).  While the First Circuit has "recognized that a district

court has some discretion to limit the exercise of the right to counsel of choice when insistence

upon it would disproportionately disadvantage the government or interfere with the ethical and

orderly administration of justice," it has "also warned that disqualification of defense counsel

should be a measure of last resort." *Diozzi*, 807 F.2d at 12 (citing *United States v. Cortellesso*,

663 F.2d 361, 363 (1st Cir. 1981)).  The import of all this, as relevant here, is that the

government cannot make an attorney a witness and thereby force his disqualification where that

attorney's testimony is not necessary to the government's case. *Id.* at 13; *see also United States*

*v. Perez*, 325 F.3d 115, 128 (2d Cir. 2003) (motion to disqualify counsel properly denied where

"any benefit the government might gain if it were allowed to call [the attorney] as a witness was

outweighed by [the defendant's] interest in retaining [the attorney] as his counsel of choice").

Here, Joyce, advised by independent counsel, has offered to stipulate that he reviewed, approved and authorized the statements Cooper made to the Ethics Commission that the government contends are false.[1]   That brings this case squarely within the control of *United States v. Diozzi*.   The facts in *Diozzi*, a criminal tax prosecution, are strikingly similar to those here.   In *Diozzi*, the defendants' counsel had submitted two lengthy memoranda to the IRS and the Department of Justice before the defendants were indicted.   807 F.2d at 11.   Before trial, the government moved to disqualify defense counsel so it could call them as trial witnesses to testify about their submissions to the IRS and DOJ, which the government alleged contained sixteen false or misleading statements, demonstrating the defendants' consciousness of guilt.   *Id.* at 12. The defendants offered to stipulate to the statements made by counsel and to the fact that they were authorized by the clients.   *Id.*   Nevertheless, despite the offer and over the defendants' objection, the court allowed the testimony and disqualified the attorneys from representing the defendants because they had become witnesses.   The defendants were convicted.   *Id.*

On appeal, the First Circuit reversed, holding that the stipulation was an adequate substitute, rendering the testimony unnecessary.   Disqualification had therefore been erroneous, a violation of the Sixth Amendment, which, as structural error, required reversal without a showing of prejudice.   *Id.* at 15-16; *see United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006) (erroneous deprivation of right to counsel of choice requires reversal even if no prejudice resulted).   The First Circuit has repeatedly reaffirmed its holding in *Diozzi*.   *See, e.g., In re*

---

[1] Joyce is prepared to stipulate that "he reviewed, approved, and authorized the submission of the specific statements" sent by Howard Cooper to the Ethics Commission; that he will not rely on any advice of Cooper concerning the statements; that he will not rely upon any advice of Cooper with respect to the underlying transactions and arrangements (as to which he states, in a separate affidavit, Cooper provided no representation or advice); and waives any right to contend that Cooper has a conflict of interest resulting from his prior representation of Joyce.   Joyce's proposed stipulation is made after consultation with independent counsel Martin Weinberg, Esq. and Robert Goldstein, Esq.   The proposed stipulation and Joyce's affidavit are attached hereto as Exhibits C & D.

*Grand Jury Proceedings*, 859 F.2d 1021, 1026 (1st Cir. 1988); *United States v. Panzardi Alvarez*, 816 F.2d 813, 816 (1st Cir. 1987).

The government tries but fails to distinguish *Diozzi*.  First, the government argues that *Diozzi* did not involve application of the crime-fraud exception.  This misses the point.  The relevant question is whether the government's allegation here—that Joyce used Cooper to make false or misleading statements to the Ethics Commission during the course of a pre-indictment investigation—provides a legitimate justification to make him a witness against Joyce and thereby disqualify him as counsel.  That is precisely the issue that the First Circuit confronted in *Diozzi*.  The Court should not permit the government to circumvent *Diozzi* merely by taking one additional step: subpoenaing Cooper's file.  The government's grounds for seeking that subpoena—that Joyce allegedly used Cooper to make false or misleading statements to a government agency in a pre-indictment investigation—are the very grounds the First Circuit in *Diozzi* rejected as insufficient to justify an infringement on the Sixth Amendment right to counsel.  Accordingly, the government's invocation of the crime-fraud exception here does not provide a basis to depart from *Diozzi*.[2]

Second, the government argues that unlike *Diozzi*, the testimony it seeks from Cooper cannot be contained "within the four corners" of the stipulation Joyce offers.  Gov't Memo. at 14.  But here, Joyce, advised by independent counsel, is prepared to stipulate that he reviewed, approved and authorized Cooper's letters to the Ethics Commission.[3]  No doubt the government

---

[2] Relatedly, the government argues that *Diozzi* involved two "circumscribed" submissions to the IRS and DOJ whereas this case involves "multiple false and misleading communications" to the Ethics Commission.  Gov't Memo. at 13-14.  In reality, the allegedly false statements relied on by the government here are contained in at most four separate and equally "circumscribed" written communications from Cooper to the Ethics Commission.  And in any event, the number of allegedly false statements has no bearing on the analysis regarding whether a stipulation will provide an adequate substitute to Cooper's testimony.

[3] The government objects that the proposed stipulation is inadequate because it will not identify the "source" of the information contained in Cooper's submissions.  But that is irrelevant where the stipulation will state that Joyce reviewed, approved, and authorized the statements, and thus the statements are properly attributable to Joyce.

would like to question Cooper on all manner of topics regarding his representation of Joyce, but its curiosity is no substitute for the kind of specificity it must show to issue a document trial subpoena to any witness, never mind a defendant's lawyer. Rule 17(c), which authorizes trial subpoenas, does not allow a party to issue such a subpoena without being able to identify with specificity what relevant and admissible evidence it expects to obtain for trial. *See United States v. Nixon*, 418 U.S. 683, 700 (1974). Here, to invoke Rule 17(c), the government would need to describe with particularity the probative, non-cumulative evidence it expects to obtain from Cooper beyond the facts in Joyce's proposed stipulation. *See id.*[4] It has not and cannot make the requisite showing. The government's speculation that Cooper's file may contain other evidence that would not be covered by a stipulation is not adequate grounds to disqualify Cooper and engage in an improper "fishing expedition" through his file. *Id.* at 699.[5]

## II.  Cooper Has No Conflict Of Interest Requiring His Withdrawal And Joyce, Advised By Independent Counsel, Will Waive The Alleged Conflicts Asserted By The Government.

The government further attempts to distinguish *Diozzi* by arguing that various potential or actual conflicts of interest, allegedly not present in that case, require Cooper's disqualification. Contrary to the government's assertion, however, the potential for conflict of interest was briefed extensively by the prosecution in *Diozzi* and obviously rejected by the First Circuit. 807 F.2d at 14-15. (An excerpt of the prosecution's brief in *Diozzi* is attached as Exhibit E.) None of the various potential conflicts which the government conjures up in its brief withstands serious

---

[4] The prosecutor, "in order to carry his burden, must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *United States v. Nixon*, 418 U.S. 683, 698, 700 (1974).

[5] The government speciously argues that the "heavily redacted" emails that Cooper produced pursuant to Judge Young's order in the grand jury proceeding further demonstrate the inadequacy of a stipulation. As previously explained to the government when that production was made, the redactions were necessary to protect privileged and work product material which was either not responsive to the grand jury subpoena or was not required to be disclosed pursuant to Judge Young's order. The redactions were fully consistent with Judge Young's order and the government did not challenge Cooper's compliance with that order or appeal the same. The government cannot now use the redactions as a basis to seek additional discovery from Cooper.

scrutiny, and none is capable of forcing Cooper's disqualification.  Further, Joyce, with advice of

independent counsel, is prepared to waive the supposed potential conflicts posited by the

government.  The case law fully supports this approach.

A criminal defendant's Sixth Amendment right to counsel of his choice can only be

overcome "by a showing of serious potential for conflict."  *In re Grand Jury Proceedings*, 859

F.2d 1021, 1024 (1st Cir. 1988).  In evaluating the potential for conflict, "the court may rely on

counsel's representations that no such conflict exists."  *United States v. Santiago-Lugo*, 167 F.3d

81, 84 (1st Cir. 1999).  "Even where an actual conflict exists, however, a defendant may waive

[the] conflict and elect to have the attorney continue representation, so long as that waiver is

knowing, intelligent and voluntary."  *Yeboah-Sefa v. Ficco*, 556 F.3d 53, 68 (1st Cir. 2009).

None of the alleged conflicts identified by the government warrants disqualification.

*Advice of Counsel Defense*.  The government first argues that disqualification is required

because of the potential that Joyce may rely on an advice of counsel defense to explain his

submissions to the Ethics Commission.  Joyce, however, has no plans to raise such a defense and

will formally waive his right to do so if Cooper remains as his counsel.  *See* Ex. C.  This

supposed conflict therefore provides no basis to disqualify Cooper.  Similarly, Joyce will not

argue that he relied on advice from Cooper when he allegedly put in place the transactions and

arrangements which form the basis of the prosecution.  He never sought or received such advice

or representation from Cooper.  *See* Ex. D.

*"Unsworn Witness" Theory*.  Second, the government argues that disqualification is

necessary because if Cooper were to represent Joyce at trial, he would effectively act as

"unsworn witness" for the defense, "subtly impart[ing] to the jury his first-hand knowledge of

the events without having to swear an oath or be subject to cross examination[.]"  *See Fonten*

*Corp.*, 469 F.3d at 23 (*quoting United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993)).  There is no merit to this claim.  The First Circuit has expressed skepticism that it would recognize the "unsworn witness" doctrine as grounds for disqualification at all, expressly reserving the question, and suggesting instead that disqualification is required only where the attorney is a "necessary witness" who is actually called to testify at trial.  *See Fonten Corp.*, 469 F.3d at 23.  Moreover, even if the First Circuit were to hold that an "unsworn witness" problem could warrant disqualification, this is not such a case.  On similar facts, the court in *Diozzi* rejected this very argument, stating unequivocally that "[d]efense counsel cannot be subject to disqualification merely for having represented their clients in a preindictment investigation." 807 F.2d at 14.  There is nothing remarkable about Cooper's representation of Joyce before the Ethics Commission that justifies a departure from this common sense principle.  The concerns the government identifies can be mitigated simply by not identifying Cooper as the attorney who represented Joyce before the Ethics Commission, and redacting his name from documentary evidence.  *See Diozzi*, 807 F.2d at 14 n.8; *United States v. Gorski*, 36 F. Supp. 3d 256, 269, n.8 (D. Mass. 2014); *United States v. Melo*, 702 F. Supp. 939, 944 (D. Mass. 1988).[6]

    *Cooper's Self-Interest*.  Finally, the government argues that Cooper should be disqualified because there exists a potential that Cooper's defense of Joyce will be limited by Cooper's own self-interest.  In the government's words, "Joyce involved Attorney Cooper in actively concealing his ongoing corruption and Joyce now seeks Cooper's representation in defending Joyce at trial against charges arising from that corrupt activity."  Gov't Memo. at 18. That claim has no merit.  At the hearing before Judge Young during the grand jury investigation,

---

[6] A copy of an unpublished order in *Melo* is attached as Exhibit F.  In it, so as to avoid a potential unsworn witness problem resulting from trial counsel's preindictment representation of the defendant, Judge Keeton ordered that trial counsel would be referred to at trial as "the attorney who was representing [the defendant]."

the government repeatedly affirmed that it has absolutely no evidence that Cooper did anything wrong.[7]  Here—while citing no evidence of any wrongdoing by Cooper—the government takes a different tack.  The government suggests that Cooper may have personal interests that conflict with Joyce's because "a more thorough investigation by Cooper of Joyce's responses to the Ethics Commission may have been warranted."  Gov't Memo. at 18.  First, as even a cursory view of Cooper's letters to the Ethics Commission indicates, he did make an extensive investigation of the facts.  More importantly, however, as the Affidavit of former Massachusetts Supreme Judicial Court Associate Justice Robert J. Cordy establishes, the government's contention "betrays a profound misunderstanding of defense counsel's role in administrative, civil or governmental investigations."  Ex. G, Affidavit of Robert J. Cordy, Esq., ¶ 7.  Put simply, even if Cooper had failed to investigate Joyce's account before communicating his defense to the Ethics Commission (which as noted, is not the case), there would be no reason for Cooper, or any similarly situated lawyer, to be concerned should that conclusion emerge at trial.

As Cordy's Affidavit explains, a lawyer representing a client before an agency like the Enforcement Division may, of course, exercise his own independent professional judgment about how much investigation to perform before making a submission to the Enforcement Division, or

---

[7] In response to the Judge Young's questions at the March 30, 2017 hearing, the government made clear that it was not accusing Cooper of any wrongdoing:

> BLOOMER:  No, I don't think it does [implicate Cooper], and I don't allege that it implicated Cooper at all . . . .
> . . . .
> BLOOMER:  And I have no information in my possession right now to suggest at all that Cooper was somehow involved in any of this.  We're focusing on what Joyce did.
> . . . .
> He [Joyce] then uses Cooper's services – and I'm not saying Cooper knows this at all, um, to facilitate and conceal this ongoing crime.

Ex. B, March 30, 2017 Hearing Tr. at 5-6.  Thus, when Judge Young observed that "I have no basis for drawing such an inference [that Cooper conspired with Joyce to make a fraudulent submission], nor do you[,]" Mr. Bloomer agreed, saying:  "No. No. No."  *Id.* at 11.

any other investigator, on his client's behalf.  *Id.* at ¶ 8.  But his professional *obligation,* under the Massachusetts Rules of Professional Conduct, is quite limited.  *Id.*  A lawyer in those circumstances runs afoul of his professional obligations only if he has "actual knowledge" that information he submits on behalf of a client to an investigative agency or a tribunal is false.  *Id.*; *see also Commonwealth v. Mitchell*, 438 Mass. 535, 552 (2003); *In re Grand Jury Subpoena (Legal Services Center)*, 615 F. Supp. 958, 969 (D. Mass. 1985) (lawyer complies with ethical requirements in advancing client's statements absent "obvious indications" of fraud).  A lawyer is under a professional obligation to "represent a client zealously within the bounds of the law," Mass. R. Prof. C. 1.3, but may not "knowingly . . . make a false statement . . . [or] offer evidence that the lawyer knows to be false."  Mass. R. Prof. C. 3.3(a)(3), 4.1.  In *Commonwealth v. Mitchell,* 438 Mass. 535 (2003), the Supreme Judicial Court held that under these professional rules a lawyer "knowingly" offers a false statement only when he has determined in "good faith" that the statement was untrue on the basis of a "firm basis in fact."  *Id.* at 546.  Because of the importance of preserving client's ability to secure zealous representation, the court explained that this "requires more than mere suspicion or conjecture on the part of counsel, more than a belief and more information than inconsistencies in statements by the defendant or in the evidence. Instead, the standard mandates that a lawyer act in good faith based on objective circumstances firmly rooted in fact."  *Id.*  Furthermore, and most pertinent to the question here, the court held that "we decline to impose an independent duty on the part of counsel to investigate because such a duty would be incompatible with the fiduciary nature of the attorney-client relationship." *Id.* at 546-47 (internal quotation omitted).

Based on these considerations, there is no basis to believe that Cooper would in any way be conflicted in representing Joyce at trial.  Whether any investigation Cooper conducted was

thorough or less than thorough, the fact remains that Cooper, as a Massachusetts lawyer, has no reason for personal concern based on the government's claims about how "thorough" his "investigation" was.  Ex. G, Cordy Aff. ¶¶ 7-8.  The government has not shown any reason to believe that Cooper did anything, or failed to do anything, except what his ethical duties allowed and even required of him.  In any event, the government should not be permitted to manufacture a conflict by making baseless criticism of Cooper's performance, claiming that Cooper's personal interests are therefore implicated, then seeking to disqualify him because of the government's own unfounded contentions.  That is particularly true where the government's own statements to Judge Young (which the government unsuccessfully sought to keep secret) make clear that it has no evidence that he knowingly participated in Joyce's alleged scheme.

In any event, all the supposed conflicts conjured up by the government are capable of being waived.  Joyce is prepared to make such a waiver and submit to a colloquy to satisfy the Court that the waiver is knowing, voluntary, and made with the advice of independent counsel. *See* Ex. C.  The Court should decline the government's invitation to reject that waiver.  A conflict may be unwaivable only in "circumstances in which an attorney has reason to fear that a vigorous defense of the client might unearth proof of the attorney's criminality." *United States v. Saccoccia*, 58 F.3d 754, 772 (1st Cir. 1995); *United States v. Soldevila-Lopez*, 17 F.3d 480, 487 n.4 (1st Cir. 1994) ("*Per se* Sixth Amendment violations have been found where trial counsel was implicated in the crime for which his client was on trial . . . ."); *see also United States v. Cain*, 671 F.3d 271, 293-94 (2d Cir. 2012) (a conflict is unwaivable only if "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation").[8]

---

[8] In this context, a waiver is considered "knowing and intelligent" if the court finds that the defendant is "aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis of this information." *United States v. Curcio*, 680 F.2d 881, 888 (2d Cir. 1982).  A waiver can be found to be

There is no basis here to reject Joyce's knowing and voluntary waiver.  The government relies on *United States v. Saccoccia* for its argument, but there the First Circuit *upheld* the defendant's waiver of conflict-free counsel and affirmed the defendant's conviction for money laundering, even though the defendant's attorney had been indicted in a foreign jurisdiction on charges that he himself conspired with the defendant to launder funds.  58 F.3d at 771-72.  Here, there is even less reason to reject Joyce's waiver than in *Saccoccia,* where Cooper is not in any way implicated in Joyce's alleged crimes.  Nor is there any merit to the government's contention that if Joyce were convicted, and the conviction affirmed on appeal, that Cooper's supposed conflicts may make the conviction vulnerable to a collateral attack under 28 U.S.C § 2255.  We have been unable to find a single example within the First Circuit of a court invalidating a defendant's knowing and voluntary conflict waiver on a § 2255 petition (or on direct appeal) and the government cites none.[9]  This Court has recently rejected a § 2255 petition based on supposed conflicts which the defendant had knowingly waived in a colloquy with the court.  *See United States v. Liceaga*, 45 F. Supp. 3d 133, 136 (D. Mass. 2014) (Gorton, J.).

### III.    Rule 16 Of The Federal Rules Of Criminal Procedure Exclusively Governs Disclosure From A Defendant And His Counsel In Criminal Cases.

The government's motion requests that the Court authorize it to subpoena Cooper's "file" without tendering a proposed subpoena or identifying specific categories of documents it seeks. Whatever the scope of its request, however, if Cooper is not disqualified, the government has no

---

intelligently made even if, in the court's view, it is "woefully foolish."  *United States v. Curcio*, 694 F.2d 14, 25 (2d Cir. 1982), *abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259, 263 (1984).

[9] In *United States v. Martorano*, the First Circuit reversed the denial of a motion for a new trial where the defendant had purported to waive a conflict resulting from joint representation, but the court had not properly inquired of the defendant whether he understood the risks associated with that type of representation.  *United States v. Martorano*, 610 F.2d 36, 39 (1st Cir. 1979).  *See United States v. Foster*, 469 F.2d 1, 5 (1st Cir. 1972) ("[I]t shall be the duty of the trial court, as early in the litigation as practicable, to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney . . . .").

right to subpoena his file or part of it.  The government cites no authority for the remarkable idea that it is entitled to issue a Rule 17(c) trial subpoena for the file of the active opposing attorney in the case.  If Cooper is not disqualified, this request must be denied, without more.

The government may obtain a Rule 17(c) trial subpoena *for a third party* if it meets the requirements of the rule, *i.e.*, that the documents sought are relevant, admissible, and identified with sufficient specificity, and that the subpoena is sought in good faith and not intended as a general "fishing expedition."  *Nixon*, 418 U.S. at 699.  But there is no basis for seeking documents from the file of a defense attorney except as authorized by the Rules of Criminal Procedure—*whether those documents are privileged or not*.  Disclosure of defense information to the prosecution is governed by the rules of discovery, which provide for disclosure of particular items and documents.  A subpoena may not be used to circumvent the limitations of the Criminal Rules.  *See Bowman Dairy v. United States*, 341 U.S. 214, 220 (1951) ("It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms."); *United States v. Tucker*, 249 F.R.D. 58, 65 (S.D.N.Y. 2008) (characterizing *Bowman Dairy* as holding that a Rule 17 trial subpoena to a party is governed by the limitations of Rule 16).  Rule 16 provides for disclosure to the government only of information which the defendant "intends to use . . . in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A).  Moreover, it flatly states that "reports, memoranda, or other documents made by the defendant, or the defendant's attorney or agent, during the case's investigation or defense" or "a statement made to . . . the defendant's attorney . . . by the defendant," are "*not subject to disclosure*."  Fed. R. Crim. P. 16(b)(2) (emphasis added).

The government's contention appears to be that it is entitled to materials which are not privileged on the ground that they are statements made for the purpose of furthering a crime or

fraud.  But Rule 16, and in particular, its limitations on government discovery of defense information, applies directly to non-privileged as well as privileged information.  Accordingly, unless Cooper is first disqualified—which for the reasons explained above he cannot be—the government has no ability to obtain Cooper's file.

### IV.    The Government Has Not Provided A Valid Basis To Issue A Rule 17(c) Trial Subpoena For Cooper's File Or Any Part Of It.

In analyzing whether the government is entitled to obtain material from Cooper's file, we must start from the proposition that confidentiality of defense counsel's file is protected by the Sixth Amendment.  *See Greater Newburyport Clamshell Alliance v. Public Service Co. of New Hampshire*, 838 F.2d 13, 21 (1st Cir. 1988) ("utmost candor between an attorney and client is essential to effective assistance of counsel.  "[T]he essence of the Sixth Amendment right is, indeed, privacy of communication with counsel." (quoting *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973)); *see also Glasser v. United States*, 315 U.S. 60, 62 (1942); *Bittaker v. Woodford*, 331 F.3d 715, 724-25 (9th Cir. 2003).  Accordingly, the government has no right to invade defense counsel's file absent "legitimate justification."  *Stein*, 541 F.3d at 156.

Even if Rule 17 could be applied to this situation, the government has not satisfied its requirements.  Rule 17 "was not intended to provide a means of discovery for criminal cases" and it does not countenance "fishing expedition[s]."  *Nixon*, 418 U.S. at 698, 700.  Accordingly, the prosecutor, "in order to carry his burden, must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity."  *Id.* at 700.[10]  Put another way, Rule 17 requires that a trial

---

[10] In addition, a party seeking authorization to issue a Rule 17(c) trial subpoena must show:

(2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*Nixon*, 418 U.S. at 699.

subpoena identify with specificity what relevant and admissible evidence the propounding party expects to obtain. *Id.* at 698, 700.  If the government "cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, the requirement of specificity will not have been met."  *United States v. Sawinski*, 2000 WL 1702032, at *2 (S.D.N.Y. 2000).

### A.  The Government Has Not Satisfied The Requirement Of Specificity.

The government has not specified which documents it seeks, other than Cooper's entire "file."  Even if the crime-fraud exception provided a basis for discovery—which, for the reasons explained below, it does not—it would not subject Cooper's entire file to disclosure but instead would apply only to those specific communications which further the alleged crimes.  *See, e.g., In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) ("the crime-fraud exception applies only where there is probable cause to believe that *the particular communication with counsel* or attorney work product was intended in some way to facilitate or to conceal the criminal activity." [emphasis added]); *Pfizer Inc. v. Lord*, 456 F.2d 545, 551 (8th Cir. 1972) (ordering production only of "those documents individually found to have been prepared in perpetration or furtherance of fraudulent activity").[11]  Because the government has failed to identify the specific categories of documents it seeks, the Court should deny the government's request for Cooper's entire file.[12]

---

[11] *See also In re A.H. Robins Co., Inc.*, 107 F.R.D. 2, 15 (D. Kan. 1985) ("the prima facie showing of crime or fraud cannot open defendant's files completely or give plaintiffs carte blanche with respect to attorney-client communications"); *MacNamara v. City of New York*, 2008 WL 186181, *4 (S.D.N.Y. 2008) ("Here, it is clear that plaintiffs have failed to proffer sufficient evidence demonstrating that the entirety of communications between Legal Bureau representatives and arresting officers at Pier 57 were made 'with an intent to further an unlawful act.'").

[12] While, as noted, the Court should not apply the crime-fraud doctrine at all, the most that the government could seek, *on its theory*, would be communications between Cooper and Joyce relating to the six specific statements Cooper made in response to inquiries of the Ethics Commission between October 2015 and February 2016 which the government contends were false.

## B.  The Crime-Fraud Exception Does Not Apply Here.

The government's request for a subpoena for Cooper's file—even if it were limited to communication between Joyce and Cooper related to the six allegedly false statements Cooper made to the Enforcement Division—should be rejected because, on its face, the request seeks material protected by the attorney-client privilege and the government has failed to show that the crime-fraud exception applies.  The government's crime-fraud argument fails for two main reasons.  First, the crime-fraud exception applies when a client uses a lawyer to commit a crime or fraud, not to defend the client against allegations that the client engaged in misconduct. Extending the crime-fraud exception to a case where the lawyer is defending a client against such allegations—as the government seeks to do here—is unwarranted by the case law and would have serious repercussions detrimental to the administration of justice.  Second, the government has failed to demonstrate, by the applicable evidentiary standards, that Joyce used Cooper to further a crime or fraud.

### 1.  The Crime-Fraud Exception.

The crime-fraud exception to the attorney-client privilege "withdraws protection [of the privilege] where the client sought or employed legal representation in order to commit or facilitate a crime or fraud."  *In re Grand Jury Proceedings*, 417 F.3d 18, 22 (1st Cir. 2005).  To successfully invoke the crime-fraud exception and disregard the attorney-client privilege the government must prove two separate things:

> (1) that the client was engaged in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; *and* (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity.

*In re Grand Jury Proceedings (Gregory P. Violette)*, 183 F.3d 71, 75 (1st Cir. 1999) (emphasis in original).  The crime-fraud exception does not apply to the defense of accusations concerning

past acts and "does not operate to remove communications concerning past or completed crimes or frauds from the attorney-client privilege." *In re Fed. Grand Jury Proceedings 89-10*, 938 F.2d 1578, 1581 (11th Cir. 1991).  Rather, it applies only when the client has engaged the services of a lawyer "in furtherance of *future* illegal conduct."  *United States v. Zolin*, 491 U.S. 554, 556 (1989) (emphasis added); *see also United States v. Kerik*, 531 F. Supp. 2d 610, 617 (S.D.N.Y. 2008) (crime-fraud exception applies where "the particular communication or work product was intended to facilitate or conceal ongoing or contemplated criminal or fraudulent activity"); Restatement (Third) of the Law Governing Lawyers § 82 cmt. e ("The exception does not apply to communications about client criminal or fraudulent acts that occurred in the past. Communications about past acts are necessary in defending against charges concerning such conduct....").

> ### 2.  Cooper Represented Joyce Only To Defend Joyce's Alleged Past Misconduct; Consequently, The Crime-Fraud Doctrine Does Not Apply.

Joyce never sought nor received any advice or representation from Cooper regarding entering into the transactions and arrangements which form the basis for this prosecution.  Ex. D, Joyce Aff. ¶ 2.  Cooper was first called upon to respond to an Ethics Commission inquiry on September 22, 2015, long after the arrangements at issue were allegedly put in place.  Ex. A, Cooper Aff. ¶ 4.  This fact alone disposes of the government's crime-fraud argument.  The crime-fraud exception simply does not extend to Cooper's pre-indictment defense of past conduct before the Ethics Commission.  The version of the crime-fraud exception the government advances—that an attorney presenting a defense on behalf of a client to a state investigative agency concerning past acts "conceals" a federal crime—has no limiting principle. Under this theory, *any* advocacy which is contradicted by *any* evidence in the possession of the government furthers a federal crime and transforms the lawyer into a witness.  (The

government's treatment of Cooper's partner's letters to *The Boston Globe* as part of a criminal cover-up triggering the crime-fraud exception demonstrates just how elastic the government's theory is.)  The First Circuit however has made clear that "[d]efense counsel cannot be subject to disqualification merely for having represented their clients in a preindictment investigation." *Diozzi*, 807 F.2d at 14.

As the Affidavit of former Associate Justice Cordy makes clear, the government's position has serious policy implications that would adversely impact the administration of justice.  In particular, if the government's approach is adopted, lawyers' ability to mount effective pre-indictment or pre-charging defenses in civil, administrative and government investigations in Massachusetts would be seriously undermined, and the significant benefits to the administration of justice that accompany pre-charging discussions between defense counsel and the government will be placed in jeopardy.  Ex. G, Cordy Aff. ¶ 10.  As Cordy attests:

> In many cases, particularly white collar matters, investigations last for years. During those investigations, lawyers representing the subject and targets of investigations often have extensive pre-indictment or pre-charging discussions with the government lawyers and agents conducting those investigations.
> . . . .
> These pre-charge discussions are typically quite useful, and often indispensable, for both sides.  Prosecutors and Investigators often pose questions to defense counsel that permit counsel to identify the focus of the government's investigation, and defense counsel often provide responses—both factual and legal—that respond to the questions in a way that permit a defendant to advance his position.  The government has an opportunity to evaluate those responses, consider their own evidence in light of those responses, and either re-evaluate or further focus their efforts.  When these pre-charge communications take place, both sides—the defense and the government lawyer or investigator conducting the investigation—typically have imperfect knowledge of the facts.
> . . . .
> Defense counsel rarely knows the strength the evidence the government has gathered against his or her client, or what particular witnesses have told the government or testified in the grand jury.  Indeed, defense lawyers must by necessity almost always rely on what their clients have told them, and are duty bound, when the situation warrants, to advance the client's position on the facts unless they actually know that the defendant is not telling the truth.

. . . .

If a defense lawyer runs the risk of disqualification, and of opening up his file to the government whenever he makes a factual representation to the government on his client's behalf before the government makes a charging decision, the practical lesson to defense counsel will be clear:  wait until trial to offer any evidence he or she might have that could contradict the government's theory of the case.  That will, in my opinion, dramatically reduce the practice, described above, of pre-charge exchanges of information between the government and defense counsel, a practice that positively impacts the administration of justice by helping weed out unmeritorious cases that would otherwise take up the Court's time, and helping the government (and the Court) by narrowing the focus of those cases the government does choose to bring.

Ex. G, Cordy Aff. ¶¶ 11-12, 15, 20.  Here, the government, having already failed in its first attempt at obtaining Cooper's file at the grand jury stage, chose to include in the indictment allegations concerning Cooper's submissions to the Ethics Commission, identifying them as racketeering acts.  As Cordy's Affidavit also explains, prosecutors could readily skirt the crime-fraud doctrine's requirement that a defendant's crime be ongoing, or in the planning stage when he consults counsel by charging defense counsel's pre-charge statements to prosecutors as separate criminal acts:

Prosecutors can almost always *choose* to describe a lawyer's submission to investigators or a government attorney conducting an investigation as a separate criminal act or as part of plan to further or conceal a criminal scheme—just as the government has done here.  For example, in the case of a Wells submission, if prosecutors believe they have evidence that contradicts what defense counsel said about the facts in the Wells submission, they could easily choose to add a count for a violation of 18 U.S.C. § 1001, or claim, in a prosecution for securities fraud in violation of 18 U.S.C. § 1348 or other criminal securities laws that the false statement defense counsel made was part of the "manner and means" of a scheme to defraud.  Similarly, if a defense lawyer makes factual statements to government lawyers investigating a health care fraud case, and the government ultimately concludes that those statements were false, the government could readily charge the client with an 18 U.S.C. § 1001 violation, or charge that the defense lawyer's statement to the government is part of the manner and means of a health care fraud scheme under 18 U.S.C. § 1347.

Indeed, that is what appears to have happened here.  The face of the government's indictment against Joyce shows that government has *chosen* to list Cooper's submissions to the Ethics Commission (and his partner's letter to the Boston Globe) as racketeering acts.  They certainly do not appear to be essential to the

government's case (there are 116 other alleged racketeering activities listed in the indictment).

*Id.* ¶¶ 18-19 (emphasis in original).  The government's claim that Cooper's defense of Joyce in an investigation by the State Ethics Commission amounts to a cover-up of the crimes for which Joyce stands indicted does not make it so, any more than Joyce's defense of the indictment is part of a supposed cover-up.  *Cf. Grunewald v. United States*, 353 U.S. 391, 402 (1957) ("[A]fter the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment.").

### 3.   The Government Has Failed To Demonstrate, By The Applicable Evidentiary Standards, That Joyce Used Cooper To Further A Crime Or Fraud.

#### a.   The Evidentiary Standards.

As noted, to establish the crime-fraud exception to the attorney-client privilege, the government must establish two things:  (1) that the defendant was engaged in or planning a crime, and (2) that the defendant intended communications with counsel to facilitate or conceal that planned or ongoing crime.  *Violette*, 183 F.3d at 75.  The Supreme Court has never decided, however, what quantum of proof is necessary to establish either element of the crime-fraud exception.  *See Zolin*, 491 U.S. at 563.

The First Circuit has held, in a case where the Sixth Amendment right to counsel was not in play, that the government must show that it has a "reasonable basis" to establish those two elements.  *Gorski*, 807 F.3d at 461.  *Gorski* also held that in those circumstances an indictment, standing alone, was sufficient to establish the first aspect of the crime-fraud test: that the defendant was engaged in criminal or fraudulent conduct.  *Id.*  The government relies on that

precedent here, citing only to the indictment in support of its invocation of the crime-fraud exception. But it cites no authority that the "reasonable basis" showing *normally* used to invoke the crime-fraud exception should apply where the Sixth Amendment right to counsel of choice would hinge on that determination. The reasonable basis standard cannot apply where confidentiality is protected by the Sixth Amendment. It cannot be that the government is entitled to strip away that confidentiality without establishing the elements of crime-fraud by at least a preponderance of the evidence, which is the standard generally used to decide much less consequential preliminary questions concerning the admissibility of evidence under Rule 104(a) of the Federal Rules of Evidence. *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 176 (1987).

Similarly, *Gorki's* holding that an indictment was sufficient to establish the first part of the crime-fraud test—that a defendant was planning or engaged in criminal activity at the time he sought the lawyer's assistance—should not apply in these circumstances. The defendant's right to counsel was not implicated in *Gorski* because the subpoena was directed to former transactional counsel, not Gorski's criminal defense counsel. 807 F.3d at 456. The constitution should not permit the government to manipulate the right to counsel through artful pleading. *Cf. Maine v. Moulton*, 474 U.S. at 170-71; *Stein*, 541 F.3d at 156. If the existence of an indictment were dispositive of the applicability of the crime-fraud exception, then in cases where defense counsel has represented the defendant in a pre-indictment investigation, all the government would need to do to veto a defendant's counsel of choice would be to add an allegation concerning that pre-indictment defense to the indictment, or, *at best*, just have some evidence that the accused's defense is not true. *See also* Ex. G, Cordy Aff. ¶ 18.

Moreover, the *Gorski* court held only that the indictment satisfied the *first* prong of the crime-fraud test, *i.e.*, that the client was engaged in criminal or fraudulent activity. 807 F.3d at

461.  As for the second prong, the court relied on findings of fact made on the basis of evidence

outside the four corners of the indictment.  *Id.*  District courts in other circuits have employed

similar analyses in cases in which the government has relied on an indictment to establish the

crime-fraud exception.  As one court explained, "[a]lthough an indictment may provide probable

cause to believe that the crime charged was committed, an indictment, standing alone, does not

provide probable cause to believe that [a defendant's] communications with [his] lawyers were

in furtherance of the conduct charged in the indictment."  *United States v. Stewart*, 2003 WL

23024461, *2 (S.D.N.Y. 2003); *see also United States v. Balsiger*, 2013 WL 3490873, at *5

(E.D. Wis. 2013).  This is true even though the government has included in an indictment

allegations concerning an attorney's involvement in the facts underlying the charge.  *See United

States v. Levin*, 2015 WL 5838579, at *4 (S.D.N.Y. 2015) (rejecting argument that indictment

necessarily satisfies second prong of crime-fraud test; noting that "the issuance of an indictment

does not necessarily equate with agreement by the Grand Jury that there is probable cause to

believe each alleged fact occurred as stated").

### b.  The Government's Failure To Make The Required Showing.

The government's invocation of the crime-fraud theory also fails because it has not

shown, by any standard of proof, that any of Cooper's statements to the Ethics Commission were

"intended by the client to facilitate or conceal" the conduct alleged to be criminal, as the crime-

fraud cases require.  It is essential to focus on what information the correspondence actually

contained, since the government's motion is premised on misleading and selective quotation and

critical omissions from the actual record of correspondence.  Some of the statements are not

shown to be false at all because the government, having failed to convince Judge Young that its

evidence satisfied crime-fraud standards, now chooses to rest entirely on the indictment, without

presenting any evidence at all.  For the reasons discussed above, this will not suffice.  Other

statements, in passages not highlighted by the government, actually disclose the very information

the defendant is accused of concealing.  Still others are neither true nor false, but are statements

of opinion, or argument about what the law requires or what the evidence shows.  Some are

deficient for all of these reasons.

### i.   *Statements Concerning The EIB Company.*

Two of the statements challenged by the government concerning Joyce's relationship

with the EIB Company literally disclose precisely what the government says they concealed:

In the first such example, the government alleges that Joyce falsely claimed, through

Cooper, that he "received no compensation" for attending a June 3, 2013 meeting with the DOI

Commissioner and thereby "concealed Joyce's receipt of $5000 per month from the EIB

Company."  Gov't Memo. at 7.  On the contrary, Cooper's letter stated explicitly that "*Senator*

*Joyce's firm has been engaged by [EIB] to provide certain legal services for a flat fee rate of*

*$5000 per month.*"  Ex. H, at 4 (emphasis added).  The letter provided a detailed and lengthy

review of all the kinds of compensation and benefits Joyce received from EIB, which included,

in addition to the $5000 monthly retainer (which covered HR related matters[13]), specific matters

not covered by the retainer (for which he billed separately), insurance defense cases referred by

the EIB Company, and the receipt of common stock in the company.  *Id.* at 4-6, 9.  The

government has not suggested anything that was omitted from this list.  As to the meeting itself,

---

[13] In point of fact, in response to a summons the Ethics Commission issued to the EIB Company, an attorney for the EIB Company represented to the Commission that while the company was asserting the attorney-client privilege to withhold documents showing "Joyce's actual work as outside general counsel on HR, personnel matters, and other issues[,] [t]here are thousands of documents showing the actual work Brian Joyce performed for [the EIB Company] pursuant to the retainer."  *See* Ex. I.

what Cooper's letter actually stated was that "Senator Joyce's firm did not open a new billing matter and did not charge any client a fee for attending the meeting." *Id.* at 7. Thus, the "falsity" of the response comes down to the government's conclusion that the retainer covered the meeting, as opposed to Joyce's contention that it did not. That issue is for a trier of fact and, indeed, will be an ultimate issue in this case.

In the second such example, the government contends that Joyce used Cooper to falsely claim that he "direct[ed] his retirement account . . . to purchase [EIB Common Stock]," and that this statement "*permitted Joyce to conceal his significant beneficial ownership of EIB Common Stock from the public and the Ethics Commission, while he actively pushed PACE legislation at the direction of the EIB CEO*[,]" and enabled him to defraud the IRS. Gov't Memo. at 8, 22 (emphasis added). Once more, it is the government's allegation that is misleading, for it completely misstates the substance and import of Cooper's letter. This portion of the letter was made in response to the Commission's inquiry based upon "[i]nformation provided to the Commission suggest[ing] that in or about 2013-2014, Mr. Joyce purchased a significant amount of [EIB] stock." *See* Ex. H, at 7. In response, after stating that Joyce had no "personal" or direct ownership, Cooper added that Joyce "*does not want to leave the Commission with the misimpression that he has never owned [EIB] stock either directly or indirectly . . . .*" *Id.* at 8 (emphasis added). Cooper then proceeded to explain how Joyce in fact did have beneficial ownership of the stock, through a retirement account; that Joyce had personally initiated the purchase; and that Joyce's retirement account continued to hold the shares.[14] *Id.* at 8-9. In other

---

[14] The IRS contends that Joyce's "SEP-IRA" was faulty because the custodian was not qualified and because he had contributed the stock rather than having the IRA purchase it, and that therefore a "rollover" of assets from his pre-existing IRA was not tax free. Whatever the merits of that issue, Joyce contends that he believed he had a valid IRA, as it appeared in the documents provided to him by EIB, (Ex. H at Tabs H & I), which were attached to Cooper's October 30, 2015 letter, similarly excised from the government's submission here. It was both permissible and possible for him to have created an IRA to hold private stock, and if it was done correctly and with a qualified custodian he would not have been required to list the stock in his annual Statement of Financial Interests (SFI). *See*

words, Cooper's letter *disclosed* – not concealed – *Joyce's beneficial ownership* to the Commission.  Once again, it cannot be said that Cooper's representation was intended to conceal criminal or fraudulent acts.   Likewise, the government gives no clue to how Cooper's letter—sent to the Ethics Commission and not the IRS—was in any way used to facilitate a tax fraud.

The other two purportedly "false" statements concerning the EIB Company relate to legal questions concerning Joyce's conduct and his assertion, through Cooper, of legal positions concerning the propriety of that conduct:

In the first such example, the government challenges Joyce's statement (contained in a January 27, 2016 letter which the government has not even bothered to attach to its memorandum) that his proposed PACE legislation "could [not] reasonably be viewed as benefitting [the EIB Company]."  *See* Ex. K.  This is a legal argument and an opinion.  The letter pointed out that the legislation, unlike similar legislation in other states (which Cooper attached to his letter), did not have a provision allowing for the sale of insurance, and that therefore "*[b]ecause of the above facts*," (a clause likewise omitted by the government), he did not believe that the bill "could reasonably be viewed as benefitting [EIB]."  *Id.*  All of the facts upon which this argument rested were set out and known to the Commission.  Legal arguments based on disclosed or known facts are not true or false.  A legal argument may be "wrong," in that the Ethics Commission may ultimately disagree with it, but it is not a "false" statement of fact.  The law recognizes, in analogous contexts, that statements of opinion are not capable of

---

Ex. J (exempting retirement holdings from disclosure).  Although large and well-known custodial firms, (like American Funds, Joyce's prior custodian), may not accept such non-traditional assets because of the difficulties of valuation and management, there are qualified custodians who do, and who act as holders of so-called "self-directed" IRAs.  *See, e.g.*, http://selfdirectedira.nuwireivestor.com.  Had Joyce gone to such a firm, and had he caused the IRA to purchase the stock (rather than purchase it himself and then contribute the stock) he would have been able to rollover all of his regular IRA assets into this self-directed IRA in a perfectly lawful tax free transaction.  In other words, Joyce had no reason to and no intent to mislead either the Ethics Commission or the IRS; he was simply misadvised as to how to accomplish a lawful objective.

being "false." *See, e.g., Cummings v. HPG Intern., Inc.*, 244 F.3d 16, 21 (1st Cir. 2001)

(statements of opinion not actionable as misrepresentations); *see also Milkovich v. Lorain*

*Journal Co.*, 497 U.S. 1, 19 (1990) (statements of opinion not actionable in defamation); *Scholz v.*

*Delp*, 473 Mass. 242, 249 (2015) (same).

Finally, the government characterizes as "false" a statement Cooper made on Joyce's

behalf concerning whether Joyce's role in the June 3, 2013 meeting with the DOI Commissioner

could be fairly considered "ministerial" (and therefore permissible, even if Joyce were

compensated). *See* Ex. H, at 6. As with the statement concerning PACE legislation, this is

simply Cooper's exposition of Joyce's legal argument and opinion. Cooper's submission set out

the facts concerning the meeting: what the purpose of the meeting was, who attended, and what

Joyce understood his role to be. *Id.* at 6-7. At the time of the meeting, the only thing anyone

involved knew was that 'Ins. Co. A' had filed a complaint against the EIB Company in *Ohio*.[15]

*Id.* What is "ministerial" is a question of law, and Cooper was setting forth Joyce's legal

argument on this point. Joyce's argument, which Cooper advanced, was that there was no

"particular matter" before the DOI, *see* Mass. Gen. Laws ch. 268A, §4(a); rather, the meeting

was to provide notice of the Ohio complaint; and in any event his involvement in the meeting

was "ministerial" within the meaning of the conflict of interest laws, *see id.* at § 4(c)(1). There is

no factual misrepresentation. Legal arguments based upon facts are not true or false.

### ii. *Statements Concerning Coffee.*

The remaining two allegedly false statements concern Joyce's receipt of coffee from a

client of his law firm who owned several coffee shop franchises.

---

[15] As it turned out, Ins. Co. A had lodged a complaint with the DOI prior to the meeting, but no one involved in the meeting, not even the Insurance Commissioner, was aware of that at the time and accordingly that complaint was not discussed. *See* Ex. L.

First, the government contends that Joyce falsely claimed, via a December 1, 2015 email and February 5, 2016 letter from Cooper to the Ethics Commission, that he "accepted free coffee in exchange for legal services in a 2013 coffee-for-legal services barter transaction."  Gov't Memo. at 22.  Although the government already failed to establish before Judge Young that this statement triggered the crime-fraud exception, it still to this day has not put forth any evidence contradicting Joyce's assertion that the 2013 batch of coffee was provided in lieu of payment for legal services rendered; an assertion which Joyce substantiated to the Ethics Commission through the submission of email communication and other non-privileged documents which demonstrate that legal services were performed for which Joyce did not bill.  *See* Ex. M.  (The government has conveniently omitted these attached records from the version of Cooper's letter which it attached as Exhibit 4 to its brief).  The government appears to contend that this assertion was false because it alleges in the indictment that the Coffee Franchise owner "had never agreed to pay [Joyce] with coffee in exchange for legal work."  Gov't Memo. at 10.  Noticeably absent from the indictment is any allegation (much less evidence) that Joyce's firm either did not actually perform the legal services for which Joyce accepted payment in the form of coffee, or had already been paid for those services.  The government has accordingly failed to meet its burden in establishing the falsity of this statement.

The government likewise contends that Joyce falsely claimed, through Cooper's December 1, 2015 email to the Ethics Commission (and Cooper's partner's April 3, 2015 letter to *The Boston Globe*), that he purchased another batch of coffee from the Franchise Owner in late 2014 which he paid for by check.  The government has not cited any authority for the proposition that a lawyer's exculpatory statement on behalf of a client to a media outlet, even if false, constitutes a crime or fraud upon the media outlet or can be said to "further" or "conceal"

29

an underlying crime triggering the crime-fraud exception.[16]  Moreover, there is no question that

Joyce paid for the coffee and that he did so before the Ethics Commission asked any questions

about the matter.  Again, as with the above statement, the government has offered no evidence

demonstrating the falsity of this statement.

### V.    The Government Has Not Met The Standard
### For An *In Camera* Examination Under *Zolin*.

While the showing needed for an *in camera* examination of presumptively privileged

documents is, to be sure, less stringent than that needed to establish the crime-fraud exception,

that standard has not been met in this case.  In the first place, the power to make a *Zolin*

examination does not supplant the Rule 17(c) requirement that the party first identify the

admissible evidence sought with specificity.  As the *Zolin* case makes clear, the *sole* purpose of

the examination is "to determine the applicability of the crime-fraud exception."  491 U.S. at

572.  The Court expressly rejected the idea of allowing routine or automatic examinations, and

warned against "fishing expeditions."  *Id.* at 571.  It is in this light that the Court must apply the

requirement that there be reasonable grounds to believe "that an *in camera* review may reveal

evidence to establish the claim that the crime-fraud exception applies."  *Id.* at 572.  In other

words, the Court is not to be enlisted in a search for useful evidence where the government

cannot articulate what relevant, admissible evidence is likely to be found, as required by Rule 17.

Here, the government has been unable to specify what it is likely find in defense

counsel's file beyond what the defendant is already prepared to admit.  The law is clear that a

"hope" that something will be found is not enough.  For the reasons discussed above in section

---

[16] A lawyer's statements to a media outlet investigating his client's conduct enjoy First Amendment protection and cannot be grounds to disqualify the attorney in an ensuing criminal prosecution, at least absent proof of knowing falsity.  As noted, the government has not produced any evidence against Joyce and has conceded it has no evidence of a knowing falsity by Cooper.

IV.A, the most the government would be entitled to subpoena *on its theory* and submit for *in camera* examination are communications between Joyce and Cooper which relate to the six statements to the Ethics Commission which the government contends were false.  But that theory would require them to show as to each set of communications that the statements to which they relate were both false and made in order to further an ongoing or future crime.  For the reasons set forth above, the government has not and cannot make that case.

### VI.   In No Event Is The Government Entitled To Cooper's Or His Firm's Opinion Work Product.

Finally, even if the Court were to find that the crime-fraud exception applies to negate the attorney-client privilege over certain communications between Joyce and Cooper, in circumstances here where there is no reason to believe Cooper was complicit in any wrongdoing, his opinion work product should remain absolutely immune from disclosure.  *See In re Green Grand Jury Proceedings*, 492 F.3d 976, 980-82 (8th Cir. 2007); *In re Grand Jury Proceedings #5 Empanelled January 28, 2004*, 401 F.3d 247, 251-52 (4th Cir. 2005); *In re Antitrust Grand Jury*, 805 F.2d 155, 168 (6th Cir. 1986).  The rationale behind this distinction is that the attorney, in addition to the client, holds the work product privilege, so it would be unreasonable to disclose his opinions and thought processes where there is no evidence he has done anything wrong.  *See In re Green*, 492 F.3d at 980.  Opinion work product comprises materials prepared with any eye towards litigation that contain mental impressions, conclusions, opinions or legal theories of an attorney.  *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1014 (1st Cir. 1988).  An attorney's recollections, including of conversations with his client, necessarily "reveal the attorney's mental impressions and thought processes" and thus "are protectable as opinion work product."  *In re Green*, 492 F.3d at 982; *see In re Grand Jury Proceedings (Duffy)*, 473 F.2d 840, 848 (8th Cir. 1973) (attorney's personal recollections are protected work product); *Sparton v.*

*United States*, 44 Fed. Cl. 557, 564 (Fed. Cl. 1999) (same); *In re Cendant Corp. Sec. Litig.*, 343

F.3d 658, 662 (3d Cir. 2003) (same).

The import of this is that, where an attorney is not alleged to have been complicit in the

predicate crime-fraud, he should not be compelled to disclose opinion work product or testify to

his memory of any oral conversations he had with his client even if the attorney-client privilege

has been negated as to those conversations.  Thus, the Eighth Circuit in *In re Green Grand Jury*

*Proceedings,* held that notwithstanding application of the crime-fraud exception, which

compelled production of certain otherwise privileged or ordinary work product documents

generated in furtherance of the fraud, no documents containing opinion work product need be

produced, and the attorney's testimony before the grand jury was properly limited to questions

relating to the origins of documents.  492 F.3d at 979.  Such would be the case here.  As Judge

Young already ruled, the work product privilege attached when Joyce initially retained Cooper in

late March 2015 to defend him against accusations that led to the Ethics Commission

investigation and ultimately to the indictment in this case.  *In re Grand Jury Subpoena,* 273 F.

Supp. 3d at 305.  Even assuming the crime-fraud exception were to apply, Cooper cannot be

compelled to produce any documents containing opinion work product or testify as to his

recollections of any conversations with Joyce.

## Conclusion

For the reasons stated above, the Court should DENY the government's motion in its

entirety.

Respectfully submitted,

BRIAN A. JOYCE

By his attorneys,

/s/ Max D. Stern
Max D. Stern (BBO #479560)
Howard M. Cooper (BBO #543842)
Christian G. Kiely (BBO #684308)
Todd & Weld LLP
One Federal Street
Boston, Massachusetts 02110
(617) 720-2626
*mdstern@toddweld.com*
*hcooper@toddweld.com*
*ckiely@toddweld.com*

HOWARD M. COOPER

By his attorney,

/s/ Martin F. Murphy
Martin F. Murphy (BBO # 363250)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
(617) 832-1000
*mmurphy@foleyhoag.com*

Dated:  April 2, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via the Court's electronic filing system, and served to all counsel of record on April 2, 2018.

/s/ Max D. Stern
Max D. Stern