# **<u>EXHIBIT G</u>**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>BRIAN AUGUSTINE JOYCE,<br><br>Defendant. | Criminal No. 1:17-CR-10378-NMG |

### AFFIDAVIT OF ROBERT J. CORDY, ESQ.

I, Robert J. Cordy, Esq., hereby depose and state:

1.      My name is Robert J. Cordy. I am a partner at McDermott Will & Emery's Boston office. I graduated from Dartmouth College in 1971 and Harvard Law School in 1974. I have been practicing law for 43 years. During that time, I have held a number of positions in government, in the Judiciary, and in the private bar in Massachusetts. I have served as a public defender, a Special Assistant Attorney General for the Massachusetts Department of Revenue, Associate General Counsel for the State Ethics Commission, an Assistant United States Attorney for the District of Massachusetts in the Public Corruption Unit of that office, Chief Legal Counsel to Governor William F. Weld, and for 16 years an Associate Justice of the Massachusetts Supreme Judicial Court. While serving on that court I was the Chair of the Rules Committee overseeing revisions to the Rules of Professional Responsibility. From 1987 to 1991, 1993 to 2001, and from 2016 to the present, I have been engaged in the private practice of law, focusing my work on representing clients in administrative, civil and criminal investigations and related proceedings.

2. I have been asked to provide my opinion as to two issues raised by the government's Motion to Disqualify Attorney Howard M. Cooper and Request to Authorize the Issuance of a Subpoena to Attorney Howard M. Cooper. First, I have been asked to provide my opinion concerning the obligations of a lawyer who responds to requests for information from the State Ethics Commission. Second, I have been asked to address the practical consequences to the administration of justice of an order disqualifying defense counsel in a criminal case, based on the defense counsel's representation of the defendant in a related investigation prior to charges being filed.

3. The Massachusetts State Ethics Commission is a state administrative agency which promotes and enforces the ethical standards for public officials found in G.L. c. 268A-268B. It has the authority to impose civil financial penalties, c. 268B, §4(j)(3), and it may refer matters to the United States Attorney or other public prosecutors for possible criminal prosecution, along with evidence it has collected. G.L. c. 268B, §4(a). The Ethics Commission's staff is organized into two divisions: a Legal Division and an Enforcement Division. The Legal Division drafts legal opinions and regulations and provides advice, on request, to public officials and others. The Enforcement Division investigates alleged violations of G.L. c. 268A and G.L. c. 268B.

4. Complaints about the conduct of public officials that come to Ethics Commission staff are referred to the Enforcement Division for investigation. The Enforcement Division can also commence investigations on its own initiative, based on information it sees in newspaper or other media accounts. The Enforcement Division often speaks to witnesses, including the complaining witness if they are aware of his or her identity, to gather information concerning the complaint or other information the Enforcement Division staff has seen. The Enforcement

Division staff may seek the public official's response to the allegations, which can include a factual admission or denial, an explanation, a legal argument, or other information concerning the allegation. After the staff review, the Commission may then authorize a "preliminary inquiry" into the alleged violations, during which the Commission may utilize its subpoena power. If, after the preliminary inquiry, the Commission concludes that formal administrative charges are warranted, the Commission commences an adjudicatory hearing. *See Doe v. State Ethics Commission*, 444 Mass. 269, 271-72 (2005).

5. A person investigated by the Commission is entitled to be represented by counsel. The conduct of such an attorney is governed by the Massachusetts Rules of Professional Conduct (adopted by SJC Rule 3:07). (Of note, under Local Rule 83.6.1, these rules also govern practice before the United States District Court.)

6. I understand from the government's Motion to Disqualify that Mr. Cooper represented former State Senator Brian Joyce in an investigation conducted by the Commission's Enforcement Division Staff. I also understand that the government seeks to disqualify Mr. Cooper because, among other reasons, it asserts that Mr. Cooper's representation of Joyce at trial might be impacted out of concern by Mr. Cooper that, at least from the government's perspective, "a more thorough investigation by Cooper of Joyce's responses to the Ethics Commission may have been warranted." The government appears to argue that Cooper may be concerned that, at trial, his allegedly inadequate investigation would be exposed.

7. In my opinion, the government's argument betrays a profound misunderstanding of defense counsel's role in administrative, civil or governmental investigations, including investigations—like the Enforcement Division's investigation of Mr. Joyce—that could lead to adjudicatory proceedings. At the outset, let me state that I have not reviewed what Mr. Cooper

DM_US 89762826-1.T02529.0010

did to investigate the matters about which the Ethics Commission inquired and I express no opinion concerning the quality or thoroughness of any investigation he conducted. Since those matters are protected by the attorney-client privilege and attorney work-product doctrine, it would be inappropriate for me to do so. But whether any investigation Cooper conducted was thorough or less than thorough, the fact remains that Mr. Cooper, as a member of the Massachusetts Bar, should have no cause for concern under the circumstances unless he had "actual knowledge" as the Courts have defined that term, of the falsity of a fact presented to Enforcement Division.

8. A lawyer representing a client before an agency like the Enforcement Division may, of course, exercise his own independent professional judgment about how much investigation to perform before making a submission to the Enforcement Division, or any other investigator, on his client's behalf. But his professional *obligation*, under the Massachusetts Rules of Professional Responsibility is quite limited. A lawyer in those circumstances runs afoul of his professional obligations only if he submits information or evidence on behalf of a client to an investigative agency or a tribunal that he has "actual knowledge" is false. The lawyer is bound to "represent a client zealously within the bounds of the law," Mass. R. Prof. C. 1.3, but he may not "knowingly . . . make a false statement . . . [or] offer evidence that the lawyer knows to be false." Mass. R. Prof. C. 3.3(a)(3); 4.1. In *Commonwealth v. Mitchell,* 438 Mass. 535 (2003), the Supreme Judicial Court held that under these professional rules a lawyer "knowingly" makes a false statement when he has determined in "good faith" that the statement was untrue on a "firm basis in fact." Because of the importance of preserving a client's ability to secure zealous representation, the Court explained that this "requires more than mere suspicion or conjecture on the part of counsel, more than a belief, and more information than

DM_US 89762826-1.T02529.0010

inconsistencies in statements by the defendant or in the evidence. Instead, the standard mandates that a lawyer act in good faith based on objective circumstances firmly rooted in fact." *Id.* at 546. Further, and most pertinent to the question here, the Court held that "(t)he lawyer many act on the information he or she possesses, and we decline to impose an independent duty on the part of counsel to investigate because such a duty would be incompatible with the fiduciary nature of the attorney-client relationship." *Id.* at 546-47 (internal quotation omitted). Based on these considerations, it is my opinion that, even assuming what the government has stated is true (*i.e.,* that a "more thorough investigation . . . . may have been warranted), there would still be no reason to believe that Mr. Cooper would in any way be conflicted in representing Joyce at trial. Such a conflict would exist only if the government could present evidence that Mr. Cooper *actually knew* that factual statements he made on Joyce's behalf were false.

9. Second, I have also been asked to give my views on the implications of the government's Motion for Disqualification on the administration of justice in cases where civil, administrative and government investigations precede or accompany actual or potential criminal charges.

10. In my opinion, the approach the government has taken in this case, if endorsed by the Court, is likely to change the way lawyers in the District practice—a change that, in my view, would be detrimental to the administration of justice. In particular, if the Court rules in the government's favor in this case, defense lawyers' ability to mount effective pre-indictment or pre-charging defenses in civil, administrative and government investigations in Massachusetts would be seriously undermined, and the significant benefits to the administration of justice that accompany pre-charging discussions between defense counsel and the government will be placed in jeopardy.

11.     In many cases, particularly white collar matters, investigations last for years. During those investigations, lawyers representing the subject and targets of investigations often have extensive pre-indictment or pre-charging discussions with the government lawyers and agents conducting those investigations. Those discussion can take place during purely administrative investigations (like those conducted by the Environmental Protection Agency, for example), investigations that might lead to civil charges or criminal charges (like investigations by the Securities and Exchange Commission), or criminal investigations, like those conducted by the United States Attorney's Office.

12.     These pre-charge discussions are typically quite useful, and often indispensable, for both sides. Prosecutors and Investigators often pose questions to defense counsel that permit counsel to identify the focus of the government's investigation, and defense counsel often provide responses—both factual and legal—that respond to the questions in a way that permit a defendant to advance his position. The government has an opportunity to evaluate those responses, consider their own evidence in light of those responses, and either re-evaluate or further focus their efforts. When these pre-charge communications take place, both sides—the defense and the government lawyer or investigator conducting the investigation—typically have imperfect knowledge of the facts. Defense counsel is unlikely to know, for example, what statements or testimony the government has from other witnesses. The government, in turn, may well not understand what explanations, factual or legal, the subject or target might have for his conduct. Creating an environment where defense counsel and investigators can engage in the process of exchanging information helps both sides.

13.     As I have mentioned, this process plays out in a number of different contexts. For example, in SEC investigations, Commission staff typically inform targets of enforcement action

that the staff have made a preliminary determination to bring a complaint alleging violations of the securities laws against that individual.[1] This notice, called a Wells Notice, gives the potential target of an enforcement action the opportunity to respond, through counsel, to the potential charges, and to provide a written explanation of the facts and the law from the target and the target's counsel's perspective. Wells submissions by defense counsel not infrequently result in the SEC staff deciding *not* to go forward with charges against individuals, or narrowing the scope of charges it does brings, although of course in many cases the SEC brings charges, or makes criminal referrals to the Department of Justice, even after defense counsel makes a Wells submission. Indeed, the SEC, as the Court is aware is a primary referral source for criminal securities fraud cases. Similarly, although the practice is less formal, the United States Attorney's Office often meets with counsel for subject or targets of criminal investigations before they bring charges against counsel's client. Permitting the defendant, through counsel, to explain his conduct, or put it in context, not infrequently results in the government choosing not to bring charges, or to narrow the scope of those charges. But, of course, targets are often indicted notwithstanding their lawyers' pre-indictment presentations.

14.     Although those discussions can sometimes result in settlements (in the case of the SEC), or pleas or other dispositions, such a deferred prosecution agreement in a criminal case (in the case of the Department of Justice) they typically do not begin as "settlement negotiations" protected under Fed. R. Evid. 408.[2] Indeed, defense counsel in these contexts typically seek to

---

[1] *See* Securities and Exchange Commission Enforcement Division, Enforcement Manual, at 19-22, https://www.sec.gov/divisions/enforce/enforcementmanual.pdf

[2] Rule 408 provides as follows:

> (a) Prohibited Uses. Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

7

persuade the government not to bring charges at all rather than reach an agreed upon "settlement." Thus, counsel recognize that statements made by counsel in these communications are generally not protected as settlement communications, and may be admissible against the subject or target of the investigation under Fed. R. Evid. 801(2)(C)-(D) as authorized statements or statements of an agent.

15.  As I mentioned, in most cases, the exchange of information must of necessity rely on imperfect information. Defense counsel rarely knows the strength the evidence the government has gathered against his or her client, or what particular witnesses have told the government or testified in the grand jury. Indeed, defense lawyers must by necessity almost always rely on what their clients have told them, and are duty bound, when the situation warrants, to advance the client's position on the facts unless they actually know that the defendant is not telling the truth.

16.  Experienced counsel recognize that, in some circumstances, factual statements made by defense counsel could in fact be admissible against their clients. However, experienced defense counsel do not expect that they will be *disqualified* by advancing a client's position

---

(1) furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

(b) Exceptions. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

The SEC has gone so far as to permit the staff to reject a Wells submission if defense counsel contend that they are protected by Fed. R. Evid. 408. *See* Securities and Exchange Commission Enforcement Division, Enforcement Manual, at 21-22, https://www.sec.gov/divisions/enforce/enforcementmanual.pdf.

before the charging decision is made. Nor do experienced lawyers expect that, in the event their efforts proved to be unsuccessful, that the government's investigators could thereby gain access to their files, including core attorney-client communications and protected work-product.

17. Cooper's correspondence with the Ethics Commission on Joyce's behalf falls squarely clearly within the practice I have described. The Ethics Commission's Enforcement Division—that is, the arm of the Ethics Commission which investigates complaints about alleged violations of the State Ethics laws, and recommends to the Commissioners whether to bring an enforcement action against the public official in question—asked Cooper for explanations about certain information it had obtained concerning Joyce's conduct. Cooper provided factual explanations on Joyce's behalf and also made arguments about the legal implications of the facts he presented. This process helped educate Cooper about the areas of the Ethics Commission's focus, and gave the Ethics Commission information that it could seek to corroborate or disprove—the classic kind of exchange common in white collar investigations, useful to both sides.

18. I understand from the government's filings in this case that the government contends that this case is different than most cases, because the indictment charges that Cooper's letters to the Ethics Commission were separate racketeering acts. In my view, the distinction the government advances is, as a practical matter, meaningless because it has no limiting principle. Prosecutors can almost always *choose* to describe a lawyer's submission to investigators or a government attorney conducting an investigation as a separate criminal act or as part of plan to further or conceal a criminal scheme—just as the government has done here. For example, in the case of a Wells submission, if prosecutors believe they have evidence that contradicts what defense counsel said about the facts in the Wells submission, they could easily choose to add a


count for a violation of 18 U.S.C. § 1001, or claim, in a prosecution for securities fraud in violation of 18 U.S.C. §1348 or other criminal securities laws that the false statement defense counsel made was part of the "manner and means" of a scheme to defraud. Similarly, if a defense lawyer makes factual statements to government lawyers investigating a health care fraud case, and the government ultimately concludes that those statements were false, the government could readily charge the client with an 18 U.S.C. § 1001 violation, or charge that the defense lawyer's statement to the government is part of the manner and means of a health care fraud scheme under 18 U.S.C. § 1347.

19. Indeed, that is what appears to have happened here. The face of the government's indictment against Joyce shows that government has *chosen* to list Cooper's submissions to the Ethics Commission (and his partner's letter to the Boston Globe) as racketeering acts. They certainly do not appear to be essential to the government's case (there are 116 other alleged racketeering activities listed in the indictment). I do not understand Cooper to be complaining that the government did so here. Indeed, in my view, defense counsel should generally have little grounds to complain when prosecutors chose to offer defense counsel's statements as evidence against a defendant. That is merely a consequence of the application of Fed. R. Evid. 801(d)(2)(C)-(D).[3]

20. What is different about this case is that the government is not only seeking to use the letters Cooper sent to the government on Joyce's behalf as evidence against Joyce, it is seeking to use them as a basis for disqualifying Cooper, and even as a basis for a request to the

---

[3] As the First Circuit held in *United States v. Diozzi*, 807 F.2d 10 (1st Cir. 1986), recognizing that counsel's statements are admissible against a defendant does not mean that the Court should disqualify defense counsel. It is my understanding that here, as in *Diozzi*, Joyce has offered to stipulate the statements Cooper made were made on his behalf, after Joyce reviewed and approved them. Further, I understand that Joyce has agreed that he will not rely on any advice of counsel defense in connection with the letters in question.

Court to subpoena Cooper's client files. This is, to my knowledge, unprecedented for the government to do in a case where the government has not pointed to any evidence that Cooper was a knowing participant in Joyce's alleged wrongdoing, or suggested that it has evidence that Cooper advised Joyce about establishing any of the allegedly corrupt relationships alleged in the indictment. If a defense lawyer runs the risk of disqualification, and of opening up his file to the government whenever he makes a factual representation to the government on his client's behalf *before* the government makes a charging decision, the practical lesson to defense counsel will be clear: wait until trial to offer any evidence he or she might have that could contradict the government's theory of the case. That will, in my opinion, dramatically reduce the practice, described above, of pre-charge exchanges of information between the government and defense counsel, a practice that positively impacts the administration of justice by helping weed out unmeritorious cases that would otherwise take up the Court's time, and helping the government (and the Court) by narrowing the focus of those cases the government does choose to bring.

SWORN AND SUBSCRIBED TO this 26th day of March 2018.

_____
ROBERT J. CORDY, ESQ.