UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> BRIAN AUGUSTINE JOYCE, <br><br> Defendant. | Criminal No. 1:17-CR-10378-NMG <br><br> **LEAVE TO FILE GRANTED ON APRIL 20, 2018** |

**SURREPLY IN OPPOSITION TO THE GOVERNMENT'S MOTION TO DISQUALIFY ATTORNEY HOWARD M. COOPER AND REQUEST FOR AUTHORIZATION TO ISSUE A SUBPOENA TO HOWARD M. COOPER**

**I.   The Government Has Not Shown A Supportable Basis To Disqualify Attorney Cooper Or To Subpoena Part Of His File.**

On one point the parties agree: the indictment of Brian Joyce thoroughly transformed the posture of the case. But the government chooses to ignore the most consequential aspect of this change – that Joyce's choice of counsel now enjoys the protection of the Sixth Amendment. *United States v. Gouveia*, 467 U.S. 180, 185 (1984). The government's reply brief fails to address the constitutional significance of the fact of Joyce's indictment; indeed, the Sixth Amendment is referred to only once, in passing. (Government Reply at p. 12). That amendment, however, casts upon the prosecution a "heavy burden," *United States v. Diozzi*, 807 F.2d 10, 12 (1st Cir. 1986), to establish that the government's legitimate need to override the defendant's right to be represented by the attorney he chose.

*Diozzi* stands for the proposition that, under the Sixth Amendment, where the government seeks disqualification in order the make defense counsel a witness, it must show that counsel possesses specific, significant, admissible evidence that the government cannot obtain without counsel's testimony. Where, as in *Diozzi* (and here), the defendant has offered to provide that

testimony by stipulation, the defendant cannot be deprived of counsel of choice; doing so results in reversal, without any showing of prejudice. *Id.* at 15-16; *see United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006).

The prosecutors here contend that this case is different, because the prosecutors in Diozzi did not specifically invoke the crime-fraud exception. But the *Diozzi* prosecutors were seeking the same result as the government seeks here (putting defense counsel on the witness stand) and on the same grounds (that the clients were said to have made false statements in their defense). The fact that the words "crime-fraud" were not used hardly qualifies as a meaningful distinction.

The government also contends that the Court should sidestep *Diozzi* by first examining defense counsel's file, in camera, pursuant to *United States v. Zolin*, 491 U.S. 554 (1989). The government goes so far as to suggest that this is the "*practice*." Government Reply, at p. 8 (emphasis added). But the cases they cite provide no support for the existence of such a "practice," and the Court should not initiate one here. The government cites only one criminal case where an *in camera* proceeding was held in connection with a disqualification motion, *United States v. Harris*, 2014 WL 4930811 (E.D. Va. 2014); there, as the government omits to mention, the defendant *did not object* to the Court conducting an *in camera* review—hardly the kind of precedent that establishes a practice.[1] And there are compelling reasons why this Court should not start such a practice now. First, in every case, defense counsel possesses some information the government does not, and surely any lawyer, including prosecutors, would want

---

[1] The docket reveals that defendant did not object to the court holding an *in camera* hearing to determine crime-fraud, except to reiterate his contention, like that made here and in *Diozzi*, that disqualification was not warranted because counsel's testimony was in any event not necessary. See Case No. 2:14-cr-00076, ECF Nos. 30 and 39. After the inquiry, the court indicated its doubt that counsel's testimony was needed, 2014 WL 4930811*4, and ultimately denied the motion to disqualify.  ECF No. 76.

Of the other two cases cited for this supposed "practice," only *Renner v. Chase Manhattan Bank*, No. 98 CV 926, 2001 WL 1819215, a civil case, involved a *Zolin* review. The footnote cited in *SEC v. Kimmes*, 759 F. Supp. 430, 438 n. 18 (N.D. Il. 1991) does not even mention the prospect of any *in camera* review.

to know the answer to "unanswered questions" in their opponent's file.  But the Rules of Criminal Procedure define what questions the defense must answer and when it must answer them.  *See* Fed R. Crim. P. 16.  The crime-fraud exception is not a tool to permit prosecutors to satisfy their curiosity about "unanswered questions" that their review of defense lawyer's file might answer.[2]  Second, serious mischief (and the waste of judicial resources)[3] would result from a decision that courts should review attorney-client communications *in camera* whenever the government contends that a defense lawyer's pre-indictment advocacy for his or her client included false representations of fact.  As former Associate Justice Cordy's Affidavit demonstrates, prosecutors could easily choose to label pre-charge advocacy as part and parcel of a criminal scheme, just as the government has done here.  *See* Cordy Aff. ¶ 18, ECF No. 69-7.  In

---

[2] The government seeks a broad range of information:

- Other "material" information concerning the EIB and Coffee subject matters which Joyce communicated to Cooper but which were not then communicated to the Ethics Commission. (Government Reply at p. 3)

- Whether there were other sources, beside Joyce, for information provided to the Ethics Commission. (Government Reply at p. 3)

- Whether Joyce told Cooper that he caused the purchase of EIB stock in his wife's name. (Government Reply at p. 13)

- Whether Joyce told Cooper that he used a bank loan, rather than IRA funds, to make the initial purchase of EIB stock. (Government Reply at p. 13)

- Whether Joyce told Cooper about his meeting conversations with the Franchise Owner and Relative. (Government Reply at p. 13)

[3] In deciding whether to conduct an *in camera* review, the court can consider "the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply."  *United States v. Zolin*, 109 491 U.S. 554, 572 (1989).  Here, defense counsel estimates that there would be thousands of emails and electronic documents, comprising tens of thousands of pages, which are potentially responsive to the government's proposed subpoena.   This is not surprising given that the subpoena seeks all documents and communications *through the present day* which in any way concern four of the six alleged schemes in the government's 100 plus page indictment.  The court should consider the burden not only of reviewing material responsive to the government's subpoena, but judicial and party costs in time and effort as well as the delay caused by inevitable ongoing litigation concerning the scope of the privilege and work product protection, and the applicability of the crime-fraud exception to particular documents.

the federal judicial systems, judicial inspection of lawyers' files has been a rare exception; not the rule, and there is every reason to maintain that status quo.

In sum, *Zolin* is not a discovery tool for the government; its sole purpose is to determine whether documents support a finding that the attorney was used commit a crime or fraud. 491 U.S. at 572.[4] As opposed to grand jury proceedings and civil cases, government discovery from the defendant in a criminal case is strictly limited by Rule 16.

Furthermore, *Zolin* – even as applied in its normal *non*-Sixth Amendment context – requires the government to articulate a "showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence the claim that the crime-fraud exception applies." 491 U.S. at 572 (internal quotations omitted). The government contends in this connection that the defendant's indictment, standing by itself, is sufficient to make this showing. (Government Reply at p. 6). That claim is without merit.

In the first place, it is clear that the government's theory does not, on its face, fit the crime-fraud mold, since Cooper's representation related to past conduct, not to an ongoing or further crime. To this the government responds that the crime continued as long as Joyce received benefits in the form of legal fees or commissions, and furthermore, that the indictment charges that the statements were racketeering acts in furtherance of the underlying crime. However, the gravamen of the allegations against Joyce, under the relevant statutes, is that he agreed to perform, or did perform, certain official acts in return for certain benefits. *See McDonnell v. United States*, 136 S.Ct. 2355, 2361 (2016)

Here any such agreements had long since been formed before Cooper's representation began, and the indictment alleges no official act committed by Joyce at any time during or after

---

[4] *Zolin* itself involved an IRS summons, not a request to call a criminal defense lawyer against his own client. 491 U.S. at 556.

Cooper's representation concerning the Ethics Commission inquiries. The fact that Joyce continued to receive fees and commissions adds nothing; the alleged acts constituting a crime had long since been completed. *Cf. Grunewald v. United States*, 353 U.S. 391, 406, 413 (1957) (conspiracy ends when the "main objective" or the "central purpose" has been achieved). Indeed, the argument proves way too much; in virtually any fraud, tax evasion, or similar case in which the defendant has not yet given up his so-called "ill-gotten" gains or continues to receive benefits resulting from the allegedly criminal conduct, the government could make the same claim.[5] More importantly, Cooper's representation did not concern accomplishment of any fraud or extortion, or facilitate, arrange, or document the underlying alleged crimes. That distinguishes the circumstances here from those in *Gorski,* for example, where the Court found that the clients used the lawyer to put in place the very arrangements that constituted the crime. Here, the government has not alleged that Cooper played any role in arranging or documenting the relationships between former Senator Joyce and the individuals from whom he allegedly agreed

---

[5] There are endless familiar scenarios in which the defendant continues to enjoy the fruits of alleged criminal conduct even during an investigation. By way of example only:

- CFO of publicly traded corporation receives Wells Notice from SEC contending that he falsely certified record-setting revenue in company's financial statements the previous year. His lawyer makes a Wells submission on his behalf, arguing that he is not liable because the company's accounting was proper. While the investigation is pending, and the SEC is considering the Wells submission, the executive continues to receive installments on the bonus/stock option package he received after record-setting performance the prior year.

- Health care CEO is under investigation for pushing employees to make off-label sales of prescription drugs. His counsel makes presentation to FDA, HHS OIG, and Department of Justice lawyers considering whether to bring administrative, civil or criminal charges against him, arguing that the conduct the CEO has authorized is appropriate. During the investigation, the CEO continues in his position and receives a large salary and million dollar bonuses tied to sales revenue.

- Target of federal mail and wire fraud investigation continues to possess money received from individuals who contend that they were the victims of his allegedly fraudulent conduct. He files answer in civil proceedings denying liability to plaintiffs. His counsel makes pre-indictment presentation to the government arguing that the government cannot prove beyond a reasonable doubt that he possessed the requisite intent to defraud.

to receive secret kickbacks. The chart attached as <u>Appendix A</u> to this brief compares the various schemes alleged in the indictment with Cooper's alleged role in those schemes.

Similarly, the government's choice to allege in the indictment that Cooper's statements furthered the crime, likewise proves too much, and likewise fails. As former Justice Cordy points out, "[p]rosecutors can almost always *choose* to describe a lawyer's submission to investigators or a government attorney conducting an investigation as a separate criminal act or as part of plan to further or conceal a criminal scheme." Cordy Aff. ¶ 18, ECF No. 69-7 (emphasis in original). Thus, as Cordy's Affidavit explains, the position "the government advances is, as a practical matter, meaningless because it has no limiting principle." *Id.*

Secondly, the government has cited no case where an indictment, standing by itself, has been deemed to provide a sufficient basis for the application of the crime-fraud doctrine where a defendant's constitutional right to choice of counsel was at stake. Given the serious harm that would come from permitting the government to veto defendant's choice of counsel, the Court should be wary of extending that rule to circumstances where the defendant's choice of counsel hangs in the balance.

This motion shows why that is the case. Here, apart from the indictment, the government has failed to produce *any* factual basis for its contentions that the statements at issue furthered a crime. To give one example, the government's allegations about the EIB statements are incorrect on their face. As we have shown in our Opposition, a review of the actual letters about the EIB to the Ethics Commission demonstrates that none of them do what the government alleges they did. All the supposedly false statements were either legal arguments or disclosures of the very facts which the government claims were concealed. (Opp. at pp. 24-29). Indeed, the folly of taking an indictment on its face is graphically demonstrated by comparing what it alleges

that Cooper and Joyce "concealed," with what the letters actually said. They *reveal*, not conceal the $5000 per month retainer; they *reveal*, not conceal Joyce's beneficial ownership of EIB stock. (Opp. at pp. 25-27). Remarkably, the government makes no attempt to defend its misleading presentation. It has nothing to say in response to the defendant's analysis, other than to rest upon the contention that the indictment says the statements were false. As for the alleged coffee scheme, the government simply chooses to double down on its reliance upon the indictment alone. But this is completely inconsistent with the requirement that the government shoulder a "heavy burden" to justify disqualification and, as we point out in our Opposition, neither *Gorski* nor any other case holds that an indictment is sufficient for that purpose.

   II.   **<u>The Proposed Subpoena Is Overly Broad And Should Be Rejected.</u>**

The government served its threatened trial subpoena to Cooper, with its Reply brief, on April 16, 2018. The subpoena is extraordinarily broad – in the subject matters it addresses, in the kinds of documents it seeks, and in the date range the subpoena proposes to cover. The Court should reject the government's effort to conduct this kind of exploratory surgery on a defense lawyer's files.

*The Subpoena.* The government's propose trial subpoena calls for Cooper and his law firm to produce a broad range of documents including any that "discuss, describe, concern or related to Brian A. Joyce" and:

- the Coffee franchisee or its principals;
- *The Boston Globe*;
- the State Ethics Commission;
- Joyce's or Cooper's communication with the Ethics Commission or *The Boston Globe* concerning the coffee franchisees, its principals or certain legislation affecting the franchisees;
- The EIB Company;

- Certain SEP IRAs;
- The Massachusetts Division of Insurance or its Commissioners;
- Joyce's or Cooper's communications to the Ethics Commission or *The Boston Globe* concerning the EIB Company, the DOI, Joyce's purchase of stock in the EIB Company, and a number of official actions by Joyce.

The subpoena seeks records dating back as far as 2013 (though Cooper did not begin representing Joyce on these matters until 2015) and, even more remarkably, asks the Court to order Todd & Weld to produce documents created up to the date of this subpoena. That means that the government seeks Cooper's file relating to his work defending this case, *even after indictment* and, by its terms, sweeps broadly enough to include even communications about the disqualification motion itself. If nothing else, the breadth of the subpoena demonstrates the limitless nature of the government's theory and how far it is able and willing to take it. Defense counsel estimates that there would be thousands of emails and electronic documents, comprising tens of thousands of pages, which are potentially responsive to the government's proposed subpoena.

This goes well beyond the bounds of a permissible subpoena, even assuming that the Court concludes (as it should *not* conclude) that the government has made the kind of showing necessary to trigger the application of the crime-fraud doctrine. The crime-fraud doctrine applies only to acts which further a crime or fraud. Here, the only acts which the government contends further the crimes charged in the indictment are the six allegedly false statements made to the Ethics Commission. The government does not and could not contend that Joyce defending himself before the Ethics Commission furthers or conceals a federal crime. Therefore, the crime-fraud exception does not apply to any other aspect of Cooper's defense of Joyce before the Ethics Commission. Where applicable, the crime-fraud doctrine requires the disclosure only of attorney-client communications which furthered the alleged crimes the government has

identified. *See, e.g., In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) ("the crime-fraud exception applies only where there is probable cause to believe that *the particular communication with counsel* or attorney work product was intended in some way to facilitate or to conceal the criminal activity." [emphasis added]); *Pfizer Inc. v. Lord*, 456 F.2d 545, 551 (8th Cir. 1972) (ordering production only of "those documents individually found to have been prepared in perpetration or furtherance of fraudulent activity"); *In re A.H. Robins Co., Inc.*, 107 F.R.D. 2, 15 (D. Kan. 1985) ("the *prima facie* showing of crime or fraud cannot open defendant's files completely or give plaintiffs carte blanche with respect to attorney-client communications"); *MacNamara v. City of New York*, 2008 WL 186181, *4 (S.D.N.Y. 2008) ("Here, it is clear that plaintiffs have failed to proffer sufficient evidence demonstrating that the entirety of communications between Legal Bureau representatives and arresting officers at Pier 57 were made 'with an intent to further an unlawful act.'"). Despite this, the government's proposed subpoena, in effect, seeks the entirety of Cooper's file relating to Joyce. If the Court were to conclude that a subpoena was appropriate, the Court should limit the subpoena to communications between Cooper and Joyce relating to the six specific statements Cooper made in response to inquiries of the Ethics Commission between October 2015 and February 2016 which the government contends were false.

     Apart from its (over)breadth, the subpoena suffers from a second defect: it does not exempt any document from production on the basis of work product protection, including core opinion work product.  (*See* Opp. at 31-32.  The government's suggestion that the Court conduct a *Zolin* examination of Cooper's entire file to determine whether opinion work-product should be produced is misguided, for such a review, if ordered, would require the Court to examine

9

documents other than Joyce's communications with Cooper – the only kind of communications that, here, could arguably fall within the crime-fraud exception.

## **CONCLUSION**

The government has not provided the Court with any supportable basis for the relief it seeks. Instead, it invites the Court to join it in what can only be described as a reckless gamble, made all the more so by the fact that a mistaken disqualification would, in the event of conviction, constitute "structural" error requiring reversal without the need for any showing of prejudice. The Court should reject the invitation and should deny the motion.

Respectfully submitted,

BRIAN A. JOYCE

By his attorneys,

/s/ Max D. Stern
Max D. Stern (BBO #479560)
Howard M. Cooper (BBO #543842)
Christian G. Kiely (BBO #684308)
Todd & Weld LLP
One Federal Street
Boston, Massachusetts 02110
(617) 720-2626
*mdstern@toddweld.com*
*hcooper@toddweld.com*
*ckiely@toddweld.com*

HOWARD M. COOPER

By his attorney,

/s/ Martin F. Murphy
Martin F. Murphy (BBO # 363250)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600

(617) 832-1000<br>
*mmurphy@foleyhoag.com*

Dated:  April 20, 2018

## **CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing was sent via the Court's electronic filing system, and served to all counsel of record on April 20, 2018.

/s/ Christian G. Kiely<br>
Christian G. Kiely

## **APPENDIX A**

*Joyce's Allegedly Unlawful Schemes*

<u>Scheme 1: "The Energy Broker Kickback Scheme" (Indictment ¶¶ 15-24)</u>

*The government's allegations:* Beginning in 2011, Joyce and the Energy Broker Executive agreed that Joyce, in exchange for secret kickbacks paid as broker commissions, would use his official position as State Senator to exert pressure on and advise officials within the District and elsewhere to take official action in favor of the Energy Broker Company, as specific opportunities arose. In early 2013, Joyce and the Energy Broker Executive entered into a new broker commission agreement; again agreeing to accept secret kickbacks in the form of broker's commissions.

*Cooper's Role*. The government does not contend that Cooper played any role in establishing or documenting the alleged agreement with the Energy Broker Executive or Energy Broker Company, or any other role with respect to that alleged agreement. Nor does the government contend that Cooper played any role in connection with any official action Joyce purportedly took on behalf of the Energy Broker Executive or Company.

<u>Scheme 2:  "The Developer Kickback Scheme." (Indictment,¶¶ 25-31)</u>

*The government's allegations:* From October 2012 through 2014, Joyce and a real estate developer alleged conspired to use Joyce's position as a State Senator to pressure the Milton Planning Board to take official action in favor or the developer, as specific opportunities arose.

*Cooper's Role*. The government does not contend that Cooper played any role in establishing the alleged agreement with the real estate developer, or any other role with respect to that alleged agreement.  Nor does the government contend that Cooper played any role in connection with any official action Joyce purportedly took on behalf of the developer.

<u>S*cheme 3: "The Energy Insurance Company Bribery Scheme." (Indictment,¶¶32-37)</u>

*The government's allegations*: Beginning in 2010, the CEO of the Energy Insurance Brokerage ("EIB") agreed to give Joyce "purported additional legal business and fees" in return for Joyce's official action and assistance with property-assessed-clean-energy ("PACE") legislation and assistance obtaining favorable action from the Division of Insurance. Pursuant to this agreement, the EIB allegedly paid $5,000 to Joyce from January 2012 to January 2016.  The government does not allege that Joyce took any official action after the Ethics Commission made its first inquiry of Joyce on September 22, 2015, to which Cooper responded on Joyce's behalf. The government does not allege that Cooper played any role in Joyce's legislative activities.

*Cooper's Role*. The government does not contend that Cooper played any role in establishing the alleged agreement with the EIB. Nor does the government contend that Cooper played any role in connection with any official actions Joyce purportedly took on behalf of the Energy Broker Executive or Company.

Cooper's did represent Joyce with respect to the EIB in a State Ethics Commission investigation focused on Joyce's relationship with the EIB. The Ethics Commission made its first inquiry on September 22, 2015. Cooper responded to that inquiry in writing on October 30, 2015, and a follow up inquiry on January 27, 2016. Despite the Indictment's allegation that Joyce did not "disclose to the Ethics Commission . . . his monthly receipt of $5,000 from the EIB company, Cooper's October 30, 2015 letter informed the Ethics Commission that "Senator Joyce's firm has been engaged by [the EIB] to provide certain legal services for a flat fee rate of $5,000 per month."

<u>Scheme 4: "The EIB Common Stock—IRS Wire Fraud Scheme" Indictment, ¶¶ 38 to 47.</u>

*The government's allegations*: In 2014, the EIB Company CEO offered Joyce privately held EIB Common Stock and Joyce purchased that stock in exchange for Joyce's continue official action on behalf of EIB.

*Cooper's Role*. The government does not contend that Cooper played any role in arranging, establishing or documenting Joyce's alleged purchase of stock from EIB, which the government alleges was completed before 2014. Nor does the government contend that Cooper played any role in connection with any official actions Joyce purportedly took on behalf of EIB as a result of the purchase of the stock.

As noted above, Cooper did represent Joyce with respect to the stock purchase in a State Ethics Commission investigation focused on Joyce's relationship with the EIB, including inquiries related to his ownership of EIB stock. The Ethics Commission made its first inquiry on September 22, 2015. Cooper responded to that inquiry in writing on October 30, 2015. Cooper's response stated that Joyce "did direct his retirement account 'Brian A. Joyce SEP IRA' to purchase stock . . ."

<u>Scheme 5: "The Coffee Franchise Bribery Scheme" Indictment, ¶¶ 48 to 51.</u>

*The government's allegations*: From 2010 to 2014, a coffee franchise owner provided Joyce with between 50 and 200 pounds of coffee at no charge, and hired his law firm to provide legal services, in exchange for Joyce's use of his official position to "promote, sponsor and file state legislation that favored the Franchise Owner."

*Cooper's Role*. The government does not contend that Cooper played any role in arranging, establishing or documenting the franchises owner's retention of Joyce's law firm or provision of

free coffee to Joyce. Nor does the government contend that Cooper played any role in connection with any official actions Joyce purportedly took on behalf of the franchise owner.

Cooper did represent Joyce with respect to Joyce's relationship with the franchise owner in a State Ethics Commission investigation. The Ethics Commission first inquired about that relationship on October 28, 2015. Cooper responded to that inquiry on December 1, 2015.

*Scheme 6: "The Philadelphia Solar Company" Indictment, ¶¶ 52 to 53.*

*The government's allegations*: In 2012, the managing director of a Philadelphia solar company met with Joyce to seek his official help in connection with local permitting and pending solar legislation that could potentially affect the solar company's project in West Bridgewater. Joyce purportedly demanded a $25,000 legal fee to assist the solar company in obtaining a permit.

*Cooper's Role*. The government does not contend that Cooper played any role in connection with Joyce's proposed arrangement with the Philadelphia solar company.